## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **DURAYL TYREE VANN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO:  20-3200** |
| | ) | |
| **JEFFREY FEWELL, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

Defendants John Lobner, Ryan Schuler, Shardale Brown, Abraham Mesler, Sara Toms, Charles Patrick, Jeffrey Fewell, Kimberly Reid, and Larry Roland, by and through their undersigned counsel and in accordance with D. Kan. Rule 7.1, submit this Memorandum in Support of their Motion to Dismiss, or in the alternative, Motion for Summary Judgment, on the Second Amended Complaint [Doc. 123 ] pursuant to Fed. R. Civ. P. 12(6), or in the Alternative, Motion for Summary Judgment in accordance with Fed. R. Civ. P. 56(a).

Defendants' argue that this case should be dismissed – or in the alternative summary judgment granted in their favor.  First, Plaintiff (Inmate Vann) failed to exhaust his administrative remedies on all his claims as required by law prior to filing suit.  Second, Inmate Vann has failed to establish facts to support claims against Defendants in their individual capacities because The factual allegations asserted are either insufficient or too conclusory to establish a claim under Section 1983 and they are entitled to Qualified Immunity, either by way of dismissal or summary judgment.  Inmate Vann cannot show that the conduct complained of or documented in the record violated clearly established law at the time of the incidents.

## I.     NATURE OF THE CASE

Plaintiff Durayl Vann (Inmate Vann) is an inmate at the Wyandotte County Detention Center (WCDC).  The events upon which his Second Amended Complaint are based [Doc. 123 and Doc. 175] occurred during his pre-trial confinement at the WCDC between October 26, 2018 and January 24, 2019 under booking #2018007606.

Inmate Vann brings this action under 42 U.S.C. § 1983, advancing six counts against nine different Defendants who were at the time of the Complaint, employees of the Wyandotte County Sheriff's Office (WYSO).  The Defendants are sued only in their individual capacities.

The factual averments in the Second Amended Complaint [Docs. 123 and 175] can be summarized as follows against each Defendant:

| Count | Defendant | Factual Contention(s) |
|---|---|---|
| I | Lobner | On October 27, 2018 Deputy Lobner used excessive force on Plaintiff by assaulting, battering, and dragging Plaintiff down a flight of stairs. |
| I, II, V | Brown | On October 27, 2018 and October 28, 2018:<br>• Captain Shardale Brown used excessive force on Plaintiff by assaulting, battering, and dragging Plaintiff down a flight of stairs.<br>• In addition, Captain Brown was the supervisor in charge who directed the actions against Plaintiff.<br>• Denied Plaintiff medical attention after the use of force.<br>• Captain Brown directed that Plaintiff be placed in a restraint chair for several hours and denied him access to bathroom facilities, left the cuffs on Plaintiff for too long which caused lacerations and bleeding, and then had Plaintiff placed in segregation without allowing him to shower after he had urinated and defecated on himself.<br>• Captain Brown had Plaintiff placed in segregation for an indefinite amount of time to hide his injuries and cover-up the incident after the use of force. |
| I | Schuler | On October 27, 2018 Deputy Schuler used excessive force on Plaintiff by assaulting, battering, and dragging Plaintiff down a flight of stairs. |

2

| II | Mesler | On October 27, 2018 Deputy Mesler denied Plaintiff medical attention and medical assistance. |
|----|--------|----------------------------------------------------------------------------------------------|
| III, IV, VI | Toms | Sarah Toms was the Disciplinary Hearing Officer who presided over the disciplinary tickets issued to Plaintiff on October 27, 2018 and November 1, 2018.  Toms did not allow Plaintiff to call witnesses in his disciplinary hearings.  Toms placed Plaintiff in segregation for an indeterminate amount of time in retaliation for Plaintiff filing grievances against her and conspired with other employees to keep Plaintiff in segregation to conceal his injuries. Toms also sentenced Plaintiff to segregation longer based on his race. |
| III, IV | Patrick | Major Patrick housed Plaintiff in segregation for an indeterminate term, placed him in an unfit and unsanitary cell, confiscated Plaintiff's legal work and religious materials, blocked Plaintiff's access to courts, threatened to kill Plaintiff, falsified documents in order to keep Plaintiff in segregation. |
| IV | Reid | Deputy Reid denied Plaintiff his food trays, showers, clean clothing, hygiene and recreation time while Plaintiff was in segregation. |
| III, IV | Fewell | Warden Fewell placed Plaintiff in segregation for an indefinite term as retaliation for speaking with a camera crew about his mistreatment at the WCDC. In addition, Warden Fewell confiscated Plaintiff's legal work, mail, and blocked his access to the Courts in retaliation for Plaintiff's filing on grievances against him.  Warden Fewell had Plaintiff placed in an unfit and unsanitary cell in segregation as punishment for Plaintiff's filing of grievances.  Warden Fewell conspired with Sarah Toms and Charles Patrick to keep Plaintiff housed in segregation indeterminately in order to prevent exposure of Plaintiff's injuries and failed to inform Plaintiff of his mother's death which forced him to cremate her contrary to their religious beliefs. |
| V | Roland | Undersheriff Larry Roland failed to address Plaintiff's complaints and grievances of Plaintiff being severely abused and mistreated by his subordinates after becoming aware of the harm being done to Plaintiff.  Undersheriff Roland failed to put preventative measures in place to ensure a safe and secure environment for Plaintiff. |

These are the only allegations contained in the Second Amended Complaint or Pre-Trial Order against the individual Defendants. (Docs. 123 and 175)  Plaintiff requests a total of $690,000.00 against Defendants; $41,000.00 in punitive damages against each Defendant; and for his costs.  (Doc. 123)

## II.      STATEMENT OF FACTS

1.    Inmate Durayl Vann (Inmate Vann) was booked into the Wyandotte County Detention

Center (WCDC) on October 26, 2018 as booking number 2018007606.  (Ex. A)

2.    Inmate Vann has an extensive incarceration and disciplinary history at the WCDC.  (Ex. C, p.

2, ¶ 4; Ex. E, p. 2, ¶ 3; Ex. F, p.2, ¶ 4; Ex. G, p.1, ¶ 4; Ex. H, p. 2, ¶ 4)

*October 27, 2018 Use of Force and Denial of Medical Assistance*

3.    On October 27, 2018, Inmate Vann was transferred to F-POD and assigned to cell number 42

at approximately 9:07 a.m. (Ex. A)

4.    Deputy Abraham Mesler (Deputy Mesler) was assigned to F-POD on the night shift on

October 27, 2018. (Ex. B, P.2, ¶ 4; Ex. C, P. 2, ¶ 5)

5.    While Deputy Mesler was conducting scheduled pod checks on October 27, 2018 at

approximately 7:45 p.m., Inmate Vann asked for a paper Inmate Communication Form (ICF).

(Ex. C, p. 7, ¶ 7)

6.    Deputy Mesler informed Inmate Vann that F Pod did not have any paper forms and that he

would have to submit his request electronically kiosk (Ex. C, p. 2, ¶ 7-8)

7.    Inmate Vann began yelling loudly through his door demanding a paper ICF at the rest of the

inmates in F Pod and then began kicking at his door. (Ex. C, p. 2, ¶ 9)

8.    Other inmates responded to Vann and began joining in by yelling loudly, kicking their doors

and demanding paper ICF's. (Ex. C, p. 2, ¶ 9)

9.    This disturbance lasted for approximately one hour, with Inmate Vann leading the other

inmates in loud and indiscernible yelling with violent pounding on their cell doors.  (Ex. C, p.

3, ¶ 10)

10.     Acting Sergeant John Lobner was called at 8:53 p.m. to assess the situation.  (Ex. C, p. 3, ¶ 10; Ex. D, p. 2, ¶ 5)

11.     After consultation, it determined that Inmate Vann was attempting to control the rest of the pod by his continued behavior, and the appropriate course of action was not to accede to Inmate Vann's demands.  (Ex. C, p. 3, ¶ 10)

12.     Inmate Vann made no requests for medical assistance until the pod check at 9:05 p.m. when he informed Deputy Mesler that he was having chest pains but showed no signs of physical distress. (Ex. C, p. 3, ¶ 13)

13.     Deputy Mesler completed the pod check and called Medical to report the complaints. (Ex. C, p. 3, ¶ 13)

14.     Medical arrived to conduct medication pass at 9:34 p.m. but could not proceed to dispense medication for nearly 40 minutes, because of the disturbance Inmate Vann was causing in the pod. (Ex. C, p. 3, ¶ 14)

15.     At approximately 9:45 p.m., Inmate Vann was still creating a disturbance by kicking and yelling, beating on his cell door, and was commanding others in the Pod to do the same.  (Ex. D, p. 2, ¶ 5; Ex. F, p. 2, ¶ 7; Ex. G, p. 2, ¶ 6)

16.     Inmate Vann was angry about the facility being on lockdown and was demanding paper inmate communications forms.  (Ex. G, p. 2, ¶ 7)

17.     This request was declined as F-Pod has a kiosk available for electronic communications. (Ex. G, p. 2, ¶ 7)

18.     Shortly after his request was declined, Inmate Vann began yelling a litany of things, including that he was having chest pains and other medical issues. (Ex. G, p. 2, ¶ 8)

19.     The disturbance from Inmate Vann and others continued until around 9:45 p.m. when Acting Captain Shardale Brown, Acting Sergeant Devin Baird, Acting Sergeant John Lobner, with Deputies Roger Bilyeu, Johnathan Cortes, and Ryan Schuler arrived in F pod, and removed Inmate Vann from his cell. (Ex. C, pp. 3-4, ¶ 15)

20.     Acting housing Sergeant Devin Baird supervised the use of force on Inmate Vann and was in command of the incident.  (Ex. G, p. 3, ¶ 32)

21.     Medical staff was called to evaluate Inmate Vann, but he was uncooperative and continued yelling and screaming. (Ex. D, p. 2, ¶ 11; Ex. G, p. 2, ¶ 9; Ex. J, p. 5, ¶ 6)

22.     Despite his lack of cooperation, Medical staff was able to take his blood pressure which was within in normal limits. (Ex. E, p. 3, ¶ 18; Ex. F, p. 4, ¶ 19; Ex. G, p. 2, ¶ 11; Ex. J, p. 5, ¶ 6)

23.     A wheelchair was retrieved to help Inmate Vann to Medical but was not necessary because Medical stated that Inmate Vann was medically clear to move. (Ex. F, p. 4, ¶ 22; Ex. G, p. 2, ¶ 12)

24.     Inmate Vann refused to stand up, walk, or assist the Deputies in moving him to the lower level for transport. (Ex. D, p. 3, ¶ 13; Ex. E, p. 3, ¶ 25; Ex. G, p. 2, ¶ 13; Ex. H, p. 3, ¶ 20;)

25.     Inmate Vann kept resisting by tensing up and going limp or dead weight. (Ex. D, p. 3, ¶ 13; Ex. E, p. 3, ¶ 25; Ex. G, p. 2, ¶ 13; Ex. H, p. 3, ¶ 20)

26.     After multiple attempts to convince Inmate Vann to cooperate, and in conjunction with the continual resistance to any kind of assistance, the Deputies had no choice but to utilize a "five man carry" technique to transport him down the stairs to the lower level of the pod. (Ex. D, p. 3, ¶ 15; Ex. E, p. 3, ¶ 21; Ex. F, p. 4, ¶ 23; Ex. G, p. 3, ¶ 14)

27.     While Inmate Vann continued yelling and screaming, he bit the inside of his cheek and began to spit minimal amounts of blood. (Ex. G, p. 3, ¶ 15)

6

28.     A restraint chair was retrieved and Inmate Vann was secured in the chair by Deputies. (Ex. G, p. 3, ¶ 16)

29.     Medical staff evaluated Inmate Vann and cleared him to remain in the restraint chair. (Ex. D, p. 4, ¶ 18; Ex. G, p. 3, ¶ 17)

30.     Inmate Vann was then placed in a cell in the Intake area for monitoring.  (Ex. G, p. 3, ¶ 18; Ex. F, p. 5, ¶ 31)

31.     Inmate Vann was checked during regular intervals and in accordance with policy while in the restraint chair.  (Ex. L, M)

32.     Wyandotte County Detention Center Policy E-180 governs the use of the restraint chair. (Ex. L)

33.     Inmate Vann continued screaming and yelling and being disruptive while in the restraint chair. (Ex. F, p. 5, ¶ 31; Ex. G, p. 3, ¶ 18)

34.     After approximately two hours in the chair, Inmate Vann was removed from the chair, evaluated by Medical staff again, and then was taken up to B2 for housing at approximately 12:19 a.m. (Ex. F, p. 5, ¶ 32; Ex. G, p. 3, ¶ 19)

35.     Inmate Vann was given new bedding and new clothes and towels, as he had urinated on himself while in the restraint chair.  (Ex. F, p. 5, ¶ 33; Ex. G, p. 3, ¶ 20; Ex. M)

36.     Deputies were able to remove the leg and hand restraints and exit the cell without further incident. (Ex. F, p. 5, ¶ 33; Ex. G, p. 3, ¶ 20; Ex. M)

37.     The incident reports completed by the deputies as part of their duties and are true and accurate records of the Wyandotte County Detention Center (Ex. C, p. 4, ¶ 18; Ex. D, p. 4, ¶ 24; Ex. E, p. 4, ¶ 20; Ex. F, p. 6, ¶ 34; Ex. G, p. 3, ¶ 21; Ex. H, p. 4, ¶ 29)

38.   Captain Shardale Brown observed the use of force as part of her duties and found the actions
      taken were in accordance with policy.  (Ex. G, p. 4, ¶ 23)

39.   Captain Shardale Brown was present during the action and observed it in its entirety but was
      not directly involved in the defensive action and did not, at any point, make physical contact
      with Inmate Vann or physically touch him during this incident. (Ex. G, p. 4, ¶ 23)

40.   Throughout his placement in the restraint chair, which was less than two hours, Inmate Vann
      was monitored in accordance with policy and displayed no distress and no visible injuries
      were noted.  (Ex. M)

41.   The hand restraints were checked by medical personnel and determined their position was
      appropriate, not cutting off circulation and no cuts or bleeding or injuries were noted to the
      hands or wrists.  (Ex. J)

42.   The noise disturbance ceased after Inmate Vann's removal from F Pod, and Medical was able
      to go door-to-door to distribute medications to complete med pass. (Ex. C, p. 4, ¶ 16)

43.   Captain Andrew Carver who was not present for the use of force, reviewed the video footage
      and documentation on the use of force on Inmate Vann on October 27, 2018, and determined
      it to be within department policy and that Inmate Vann's allegations were directly refuted by
      the video footage.  (Ex. I; Ex. K)

44.   Major John Russell who was not present for the use of force on Inmate Vann on October 27,
      2018, reviewed the video footage and supporting documentation and found it to be within
      department policy.  (Ex. I; Ex. K)

45.   Undersheriff Larry Roland, who was not present for the use of force on Inmate Vann on
      October 27, 2018, reviewed the complaint from Inmate Vann and found Inmate Vann's
      allegations were unfounded.  (Ex. I; Ex. K)

*Segregation Conditions, the Hunger Strike, and Medical Review*

46.   Inmate Vann was diagnosed and regularly treated for high blood pressure during his time at WCDC and showed no signs of any other symptoms or diagnoses. (Ex. W, pp. 91, 99, 101-111)

47.   Inmate Vann was prescribed medication to treat his high blood pressure and instructed to take once per day which he regularly refused to do. (Ex. P, pp. 68,70, 73, 89, 104, 114, 119, 123, 128, 168, 185, 187; Ex. W, pp. 10-20, 91, 99, 103, 106, 108)

48.   Between 10/26/2018 to 01/24/2019, a period of 85 days, Inmate Vann was seen by Medical staff approximately 26 times. (Ex. A, Ex. W)

49.   While in B-2 (segregation) Inmate Vann went on a hunger strike and refused the meals provided to him on multiple occasions.  (Ex. W, p. 27)

50.   Inmate Vann remained in B2 until November 2, 2018 when he was placed on suicide watch and transferred to the Infirmary (I-Pod).  (Ex. A)

51.   Inmate Vann received regular meal service three times a day during his incarceration period. (Ex. N; Ex. O; Ex. P; Ex. Q; Ex. R)

52.   Medical regularly monitored his hunger strike and provided medical and mental health services to him every week.  (Ex. W, p .131)

53.   Medical made arrangements for Inmate Vann to have double portions of meals which he accepted. (Ex. O, pp. 16,18; Ex. W, pp. 90, 93, 114)

54.   Inmate Vann remained in I Pod until he was released from suicide watch and moved back into B2 on November 5, 2018 and remained in B2 until January 18, 2019 when he was moved to H Pod.  (Ex. A)

55.   Inmate Vann was transferred from H Pod on January 21, 2019 to F Pod.  (Ex. A)

*Disciplinary Hearing Process and Sanctions*

56.    Sara Toms, a civilian employee, served the as the Disciplinary Hearing Officer at the WCDC and presided over the disciplinary tickets issued to Inmate Vann during his incarceration at the WCDC on Booking #2018007606. (Ex. S, p. 1, ¶ 4, p. 5, ¶ 30; Ex. T, pp. 3, 7)

57.    Disciplinary Hearings at the Wyandotte County Detention Center are governed by policy F-185.  (Ex. V)

58.    Disciplinary hearings are regularly conducted in the Wyandotte County Sheriff's Office Adult Detention Center by one person, on a consistent basis, who is trained in conducting due process hearings. (Ex. S, p. 5, ¶ 31)

59.    At the time of Inmate Vann's disciplinary hearings, Sara Toms has been conducting these hearings in the Adult Detention Center since 2017. (Ex. S, p. 5, ¶ 32)

60.    The Disciplinary Hearing Officer was not present at the times of the incidents. (Ex. S, p. 5, ¶ 33)

61.    The written and video evidence was reviewed after the occurrence and during the hearing process. (Ex. S, p. 5, ¶ 33)

62.    The disciplinary hearing office operates under the basis of "preponderance of the evidence" which means that an inmate may be found guilty when anything over 50% of the evidence indicates guilt. (Ex. S, p. 5, ¶ 34)

63.    If the Disciplinary Hearing Officer is convinced that it is more likely than not that the inmate is guilty, the preponderance of the evidence standard has been met. (Ex. S, p. 5, ¶ 34)

64.    During 10/26/2018 to 01/24/2019, Inmate Vann received five (5) staff tickets on 10/27/2018 and two (2) staff tickets on 11/01/2018.  (Ex. S, p. 2, ¶ 5; Ex. T, pp. 3,7)

65.  The staff tickets issued for incidents were served to Inmate Vann within the required 24-hour timeframe of the occurrence.  (Ex. S, p. 3. ¶ 8)

66.  Inmate Vann was provided with more than 24 hours' notice prior to both the disciplinary hearings. (Ex. S, pp. 3-4, ¶ 19, 22, p. 3, ¶ 10; Ex. T, pp. 1-7, 5-6)

67.  Notice of the hearings was served in person and in writing. (Ex. S, p. 4, ¶ 23)

68.  The inmate's rights at the disciplinary hearing were written on the notice of hearing.  (Ex. S, p. 3, ¶ 11, 18; Ex. T, p. 2, 6)

69.  Inmate Vann was provided with a written copy of the of the hearing report and given an appeal form on both occasions.  (Ex. S, p. 3, ¶ 16, p. 4, ¶ 21; Ex. T, pp. 1-4, 5-8)

70.  Inmate Vann was further advised of his right to appeal the decision and provided with appeal forms. (Ex. S, p. 6, ¶ 37)

71.  There is no record of Inmate Vann using the appeal form to appeal any of the decisions of the Hearing Officer Toms.  (Ex. S, p. 3, ¶ 16) (Ex. S, p. 4, ¶ 21; Ex. T, p. 8)

72.  Inmate Vann was provided with the date, time, place, description of the incidents, and the identity of the persons involved. (Ex. S, p. 4, ¶ 24; Ex. T, pp. 9,10)

73.  For the first hearing, Inmate Vann requested assistance from another inmate for his hearing, which was denied as the request did not meet the criteria. (Ex. S, p. 4, ¶ 25; Ex. T, p. 1)

74.  Inmate Vann requested a witness by the name of "Bruce Tyren" but there was no such inmate in custody at the time. (Ex. S, p. 4, ¶ 26; Ex. T, p. 1)

75.  Inmate Vann also requested staff witnesses but none of them were on duty or available at the time of the hearing.  (Ex. S, p. 4, ¶ 27)

76.  No record was located on file that Inmate Vann made any witness or other requests for the second hearing. (Ex. S, p. 4, ¶ 28; Ex. T, p. 5)

77.  Inmate Vann was advised of all of his rights in person and in writing. (Ex. S, p. 5, ¶ 29)

78.  Inmate Vann chose to make statements and participate in the disciplinary hearing process. (Ex. S, p. 5, ¶ 29; Ex. T, pp. 3,7)

79.  The evidence available in these incidents was: detention center narrative reports written by sworn security staff and medical staff, body camera footage/recordings of the incident, footage/recordings obtained from the housing unit security cameras, and Inmate Vann's own statements. (Ex. S, p. 5, ¶ 35, Ex. T, pp. 3, 7)

80.  Guilty findings on the violations were based on the information and evidence available at the time of the hearings which established that it was more likely than not that Inmate Vann committed the violations. (Ex. S, p. 5, ¶ 36; Ex. T, pp. 3, 7)

81.  The hearing and sanction decisions were made only after all available information was reviewed.  (Ex. S, p. 6, ¶ 37; Ex. T, pp. 3, 7)

82.  The Disciplinary Hearing Officer provided Inmate Vann with written reports of the results of the hearings.  (Ex. S, p. 6, ¶ 37, Ex. T)

83.  Inmates are afforded an appeal process to a higher authority within the agency. (Ex. S, p. 10, ¶ 53, Ex. V)

84.  Inmate Vann has a lengthy incarceration and disciplinary history with the WCDC. (Ex. S, p. 6, ¶ 38)

85.  The disciplinary process is a continuum that includes a variety of disincentives in order to maintain control of housing areas and encourage compliance with facility rules.  (Ex. S, p. 10, ¶ 44)

86. Statistics kept by the WCDC regarding the sanctions imposed (segregation time) on Inmate Vann reflect consistency in application of the Wyandotte County Sherriff's Office Detention Center Standard Operating Procedures, F-185. (Ex. S, pp. 8, 9, ¶ 41; Ex. V)

87. At the Wyandotte County Sheriff's Office Adult Detention Center, the expectations for inmate behavior are defined and conveyed through a published Inmate Orientation, Guidelines, and Rules sheet available in both English and Spanish. (Ex. S, p. 10, ¶ 45)

88. This rules sheet is provided at the time of booking and is also available in the housing units, on the kiosks, and on the inmate tablets. (Ex. S, p. 10, ¶ 46)

89. These rules reflect what is determined to be acceptable inmate behavior and these expectations are both reasonable and attainable. (Ex. S, p. 10, ¶ 47)

90. Inmate Vann was provided a paper copy of the Inmate Orientation, Guidelines, and Rules by Deputy Coon. (Ex. S, p. 10, ¶ 48)

91. Established policy allows for the deputies to give verbal correction as well as 23-hour lockdowns and other restrictive actions such as loss of recreation time or commissary in response to inmate behavior that violates the rules. (Ex. S, p. 10, ¶ 49, 50)

92. More serious incidents that may require more serious sanctions require a formal process through disciplinary hearings to ensure due process. (Ex. S, p. 10, ¶ 51)

93. To effectively manage inmate behavior, both formal and informal discipline are consistently carried out so that the inmates and the staff see the process as fairly implemented. (Ex. S, p. 10, ¶ 52)

94. Severe restrictions within this facility are necessary to address disruptive activity and/or any assaults on other inmates and/or staff. (Ex. S, p. 11, ¶ 55)

95.    Inmate Vann had displayed behaviors that posed a direct threat to the safety of persons and to the safe and secure operations of the facility. (Ex. S, p. 11, ¶ 56)

96.    Inmate Vann's segregation status was reviewed by the Special Management team on a weekly basis.  (Ex. S, p. 11, ¶ 57)

97.    Inmate Vann was regularly monitored while in segregation. (Ex. W, pp. 128-130)

98.    Security memos pertaining to his segregation were updated regularly and as needed. (Ex. S, p. 11, ¶ 58)

99.    Inmate Vann received monthly notice of his status review by the Special Management team. (Ex. S, p. 11, ¶ 59)

100.   Once Inmate Vann was able to demonstrate a period of good behavior in compliance with facility rules, he was given a suspended disciplinary sentence and was returned to general population on 01/18/2019. (Ex. S, p. 11, ¶ 60)

101.   Sara Toms had no knowledge of any injuries to Inmate Vann during his incarcerations at the WCDC and had no access or authorization to his medical records. (Ex. S, p. 11, ¶ 61)

102.   The sanctions imposed on Inmate Vann for his disciplinary violations were based solely on Inmate Vann's behavior and disciplinary history and was necessary to ensure the safety and security of the WCDC. (Ex. S, p. 11, ¶ 63)

103.   Inmate Vann had access to medical/dental/behavioral health services. (Ex. S, p. 11, ¶ 54)

104.   Inmate Vann was given regular opportunities to shower and clean his room.  (Ex. N-R)

105.   Inmate Vann had regular access to mail services.  (Ex. Z)

106.   Inmate Vann was released from the Wyandotte County Detention Center on January 24, 2019.  (Ex. A)

107.    The grievance procedure for inmates at the WCDC is described fully in Wyandotte County

   Detention Center Standard Operating Procedures, F-100 (Ex. X).

### III.    ISSUES PRESENTED

**A.    Should Plaintiff's Claims Be Dismissed for Failing to Exhaust His**

   **Administrative Remedies in accordance with WCDC policy and as required by**

   **law?**

**B.    Are the Defendants entitled to qualified immunity either by way of dismissal or**

   **summary judgment?**

### IV.    STANDARD ON MOTION TO DISMISS

A complaint must contain enough facts to state a claim for relief that is plausible on its

face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The court need not accept as true those allegations that state only legal conclusions. *Id.*

Under this standard, "the mere metaphysical possibility that some plaintiff could prove some set

of facts in support of the pleaded claims is insufficient; the complaint must give the court reason

to believe that this plaintiff has a reasonable likelihood of mustering factual support for these

claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis

omitted).

Although Courts have traditionally construed *pro se* pleadings in a liberal fashion, *see*

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Riddle v. Mondragon*, 83 F.3d 1197, 1201-02 (10th

Cir. 1991), liberal construction does not "relieve the plaintiff of the burden of alleging sufficient

facts on which a recognized legal claim could be based." *Tank v. Donovan*, No. 11- 2439-RDR,

2012 WL 1207218, at *2 (D. Kan. Apr. 11, 2012) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)).

Similarly, Courts do not assume the role of an advocate for the *pro se* litigant by, for example, constructing arguments or searching the record for potentially viable theories. *Garrett v. Selby Conor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). A *pro se* litigant is expected to construct his or her own arguments or theories and adhere to the same rules of procedure that govern any other litigant in this district. *Hall v. Witteman*, 584 F.3d 859, 864 (10th Cir. 2009).

## V.  SUMMARY JUDGMENT STANDARD

Defendants also contend that this cause can be resolved as a matter of summary judgment. Summary judgment is required under Rule 56 of the Federal Rules of Civil Procedure when pleadings, affidavits, and any discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

To determine whether a genuine issue exists, courts will view evidence in the light most favorable to the nonmoving party and will accept only reasonable inferences. *See Allen v. Muskogee*, 119 F.3d 837, 839-40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Further, any factual dispute must be not only genuine – "such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) – but also material, as determined by substantive law, *see Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248). Where there is no genuine dispute of material fact regarding just one of the essential elements a plaintiff must prove, then summary judgment must issue in the defendant's favor. *See Sports*

*Unlimited, Inc. v. Lankford Enterprises, Inc*., 275 F.3d 996, 999 (10th Cir. 2002) (citing Adler, 144 F.3d at 671).

## VI.    ARGUMENTS AND AUTHORITIES

### A.    Should Plaintiff's Claims Be Dismissed for Failing to Exhaust His Administrative Remedies in accordance with WCDC policy and as required by law?

Under the Prison Litigation Reform Act ("PLRA"), prisoners bringing suit under § 1983 must exhaust all available administrative remedies before seeking relief in federal court. *Smith v. Rudicel*, 123 Fed. Appx. 906, 907 (10th Cir. 2005). The law plainly states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The statutory exhaustion requirement of § 1997e(a) is mandatory." *Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1167 n.5 (10th Cir. 2003). The exhaustion requirement is also a total exhaustion requirement, and it applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and *whether they allege excessive force* or some other wrong." *Horton v. Ortiz*, 138 Fed. Appx. 104, 106 (10th Cir. 2005)(emphasis added).  "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but *it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion*." *Jones v. Bock*, 549 U.S. 199, 218, 127 S. Ct. 910 (2007) (emphasis added).  "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim." *Id.* (quoting *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002)).

To satisfy the PLRA's exhaustion requirement, a prisoner must do more than simply allege he has exhausted his administrative remedies. *Id.* The pleading requirement of 1997e(a) mandates that a prisoner either "attach a copy of the applicable administrative dispositions to the complaint, or . . . describe with specificity the administrative proceeding and its outcome." *Id.* The Tenth Circuit has also determined that "total" exhaustion is required. *Ross v. County of Bernalillo*, 365 F.3d 1181, 1188,-89 (10th Cir. 2004). Under the total exhaustion prerequisite, plaintiff must have presented each and every claim raised in his complaint by way of the available prison administrative grievance procedures, or the entire complaint is subject to being dismissed without prejudice. This generally means he must have referred to the named defendants and described allegedly wrongful actions by each of them in his grievances.

The grievance procedure for inmates at the WCDC is described fully in Wyandotte County Detention Center Standard Operating Procedures, F-100 (Ex. X). The procedure allows for inmates to initiate a grievance for an alleged violation of civil, constitutional, or statutory rights or a policy; an alleged criminal or prohibited act; to resolve a conditions of confinement issue existing within the detention center that creates unsafe or unsanitary living conditions. An inmate may file a grievance at any time to bring a problem to staff's attention. Policy F-100 mandates a three-step grievance procedure available to inmates: (1) The inmate shall first take a grievance to the Pod Officer. If the inmate does not receive a satisfactory response from the Pod Officer, then the inmate may complete in writing a grievance via the commissary kiosk or through a paper Inmate Communication Form (ICF); (2) Upon receipt of an inmate grievance, the Shift Supervisor shall respond within seven calendar days; and (3) Any inmate who has a grievance that he/she feels was not answered appropriately may file an appeal to Jail Administration within ten calendar days of the receipt of an adverse decision.

This policy also clearly states that grievance procedures supplement but do not replace disciplinary procedures.  (Exhibit X, pg. 1)[1] Appeal of disciplinary hearing findings and sanctions are found in Wyandotte County Detention Center Standard Operating Procedures, F-185.  (Exhibit V) In order to appeal the sanctions imposed by a disciplinary hearing, the inmate must file an appeal in writing to the Warden and no later than seventy-two hours after receiving the decision - but the time can be extended if good cause is shown.  The Detention Warden's decision is the final step in this process.  (Exhibit V, pgs. 9-10).

Inmate Vann did not follow the policies for the grievance procedure or appeal of his disciplinary sanctions.  There is no reference in the pod logs (Ex. N-R) that Inmate Vann ever completed step one on any of his claims or spoke with a pod officer on these specific subject matters, although they do detail multiple interactions Inmate Vann had with Pod Officers.  He filed multiple electronic and paper grievances relating to the use of force on October 27, 2019 (Count I) but directed them to the Internal Affairs division and not the shift supervisor.  Internal affairs did investigate and respond.  Undersheriff Larry Roland then reviewed the complaint as well and determined it was unfounded.  Assuming arguendo, this is sufficient to meet the requirements of step two, the record does not show that Inmate Vann ever completed the third step by placing his grievance in writing to Jail Administration.  Within these same grievances, Inmate Vann does allege once that he was denied medical treatment (Count II) but does not mention Deputy Mesler or Captain Brown by name, and  again did not complete the third step by appealing to Jail Administration.  With respect to Count III (Denial of Due Process in a Disciplinary

---

[1] The electronic grievance records attached as Exhibit X cover periods from 2018 through 2020 and the conventional (paper) grievance records covered under booking #20180007606 from which these claims in the Second Amended Complaint are advanced.  Prior grievances attached to the Amended Complaint (Doc. 14) relate to an incident from 2015.  Those which claims were dismissed by this Court (Doc. 16 and 19) as barred by the statute of limitations, and in a previous case (Case No. 515: CV-03192.)  Other grievances relate to claims from late 2019 appear to have been abandoned in the Second Amended Complaint (Doc. 123).

Hearing), Inmate Vann did not follow the appeal process to appeal the results of his disciplinary hearings by filing an appeal with Jail Administration, even though he was advised of the process and provided with the appeal form.  With respect to Count IV (Retaliation), it does not appear that Inmate Vann filed any of the steps alleging retaliation by Warden Fewell, Major Patrick, or Sara Toms or Kimberly Reid.  In earlier incarcerations prior to the events in this case, he appears to have filed a complaint alleging interference with his legal mail to Major Patrick arguably completing step two, but again never completed the final step by filing his complaint with Jail Administration.  Likewise, nowhere in his grievances does Inmate Vann lodge a complaint about his meal service, the conditions of his cell, his clothing, hygiene, showers, or recreation time. There is no mention in his grievances about being retaliated against for speaking to a camera crew. With respect to Count V for Supervisory Liability, it is not clear who this claim is asserted against. Nonetheless, Inmate Vann did not file a grievance on any of the Defendants alleging facts that would support they failed as supervisors in their duties.  Finally, Count VI, Inmate Vann again does appear to have filed any grievances alleging discrimination by Sara Toms in his disciplinary hearing.

While the record demonstrates that Inmate Vann had access to the grievance system, he did not exhaust all his administrative remedies in every step in this cause before seeking relief in federal court.  While it appears he made some attempts, he did not complete the process by demonstrating some compliance with each step of policies on any of the claims he now advances which is a precursor to filing suit and bars him from relief.

**B.    Are the Defendants entitled to qualified immunity either by way of dismissal or summary judgment?**

The Defendants here are sued in their individual capacity for compensatory and punitive damages.  They assert that they are entitled to qualified immunity for their actions between October 26, 2018 and January 24, 2019 when Inmate Vann was released from the WCDC.  "Qualified immunity protects government officials from civil liability so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Arnold v. City of Olathe*, 35 F.4th 778 (10th Cir. 2022) quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The doctrine protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id*. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

A Defendant who is sued in his individual capacity may assert the doctrine of qualified immunity – which is not an affirmative defense, rather, it provides for immunity from suit. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  To overcome a qualified immunity defense, "a plaintiff must show (1) facts demonstrating the officials violated a federal constitutional or statutory right, which (2) was clearly established at the time of the defendant's conduct." *Id*.  A qualified immunity defense succeeds if a Plaintiff fails to establish either element. *Kerns v. Bader*, 663 F.3d 1173, 1180 (10th Cir. 2011).

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Cox v. Wilson*, 971 F.3d 1159, 1171 (10th Cir. 2020). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear' that *every* `reasonable official would have understood that what he is doing violates that right." *Frazier v. Evans,* 992 F.2d 1003 (10th Cir. 2021).

21

Ordinarily, to make such a showing of clearly established law, the Plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. *Callahan v. Unified Gov't of Wyandotte Cnty.,* 806 F.3d 1022, 1027 (10th Cir. 2015). Typically, the precedent must have clearly established the right "in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna,* 577 U.S. 7 (2015).

"In resolving a motion to dismiss based on qualified immunity, a court must consider 'whether the facts that a plaintiff has alleged make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Leverington v. City of Colo. Springs*, 643 F.3d 719, 732 (10th Cir. 2011) (ellipsis omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). A complaint must explain what each defendant did to the plaintiff, when the defendant did it, how the defendant's actions harmed the plaintiff, and what specific legal right the plaintiff believes the defendant violated. *Robbins v. Oklahoma*, 519 F. 3d 1242, 1250 (10th Cir. 2008); *Nasious v. Two Unkonwn B.I.C.E. Agents,* 492 F.3d 1158, 1163 (10th Cir. 2007).

"When a defendant asserts qualified immunity in a summary judgment motion, the plaintiff must show that (1) a reasonable jury could find facts supporting a violation of a constitutional right and (2) the right was clearly established at the time of the violation." *Wilkins v. City of Tulsa*, 33 F.4th 1265, 1272 (10th Cir. 2022); see also *Duda v. Elder*, 7 F.4th 899, 909 (10th Cir. 2021). A defendant is entitled to qualified immunity if the plaintiff fails to satisfy either prong. *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009); *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021).

Because qualified immunity is raised in this motion by way of dismissal or alternatively summary judgment, Inmate Vann carries the burden of establishing that the Defendants violated

clearly established law. *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000). Here, Inmate Vann cannot establish his burden for any of his claims as discussed in turn below. The facts he asserts are largely conclusory in nature and further unsupported in the record before the Court. In addition, Inmate Vann can neither show any facts from which a reasonable jury could find in his favor, nor that conduct he complaints of - violated a clearly established right.

### 1. *Count I – Excessive Use of Force*

Inmate Vann alleges that Deputies John Lobner, Austin Schuler, and Captain Shardale Brown used excessive force on Plaintiff by assaulting, battering, and dragging him down a flight of stairs on October 27, 2018. In addition, Inmate Vann alleges that Captain Brown had him placed in a restraint chair for several hours causing him to soil himself, and left his handcuffs on too long causing his wrists to bleed (Doc. 123) and the Pre-Trial Order (Doc. 175).

To establish a due process violation under the Fourteenth Amendment for excessive use of force against a pre-trial detainee, the Courts look to the precedent in *Kingsley v. Hendrickson*, 135 S. Ct, 2466 (2015). *Kingsley* held that the "Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.'" *Id.* quoting *Graham v. Connor*, 490 U.S. 386, 395, n. 10 (1989).

When a pretrial detainee brings a Fourteenth Amendment excessive force claim, he or she must allege facts that, if taken as true, plausibly support the conclusion "that the force purposely or knowingly used against him [or her] was objectively unreasonable." See *Kingsley*, 576 U.S. at 396-97; see also *Brown v. Flowers*, 974 F.3d 1178, 1182-83 (10th Cir. 2020) (holding that "to make out a constitutional violation [of excessive force, a pretrial detainee] must only demonstrate that [the prison official's] conduct 'was objectively harmful enough to establish a constitutional

violation'"). Force may amount to unconstitutional punishment of a pretrial detainee if it "consist[s] of actions taken with an 'expressed intent to punish.'" *Kingsley*, 576 U.S. at 398 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538 (1979)). In the alternative, the pretrial detainee may "show[] that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 561).

To determine if a pretrial detainee has pled a plausible claim of objectively unreasonable force, the Court also considers "the 'facts and circumstances of each particular case . . . from the perspective of a reasonable officer on the scene, including what the officer knew at the time." *Kingsley*, 576 U.S. at 397. This analysis may include considering factors such as the following: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of [any] security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting," among others. [Doc. 14, pgs. 7-8]

This Court has consistently held that not every isolated battery or injury to an inmate amounts to a federal constitutional violation. See *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (stating that not "every malevolent touch by a prison guard gives rise to a federal cause of action.") (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights")). In *Snyder v. Spilde*, the District Court of Colorado found that merely grabbing and twisting the Plaintiff's arms did not allege a constitutional violation. See e.g., *Norton v. The City of Marietta*, 432 F.3d 1145, 1156 (10th Cir. 2005) (dismissing claim in which prison guards were alleged to have injured prisoner by grabbing him around his neck and twisting it

because the guards' actions were not objectively harmful enough to establish a constitutional violation); *Reed v. Smith*, No. 97-6341, 1999 WL 345492, at *4 (10th Cir. 1999) (dismissing excessive force claim based on allegations that prison officials grabbed inmate, tried to ram him into a wall, and dragged him while walking him through the prison); *Marshall*, 415 Fed. App'x at 853–54 (dismissing excessive force claim based on allegations that corrections officer dug his fingernails into prisoner's arm without cause to do so resulting in redness and bruising). *Accord De Walt v. Carter*, 224 F.3d 607, 610–11 (7th Cir. 2000) (holding that shoving a prisoner into a doorframe, which resulted in bruising on his back, did not state a constitutional violation); *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (holding that bumping, grabbing, elbowing, and pushing a prisoner was "not sufficiently serious or harmful to reach constitutional dimensions."); *Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir. 1985) (pushing cubicle-cell wall onto prisoner's leg, causing bruises, was insufficient use of force to state a constitutional violation); Olson v. Coleman, 804 F. Supp. 148, 149–50 (D. Kan. 1982) (single blow to prisoner's head while escorting him into prison, causing contusion, was de minimis use of force not repugnant to conscience of mankind). *Snyder v. Spilde*, No. 15-cv-2169-GPG, 2016 WL 1059612, at *3–4 (D. Colo. March 17, 2016).

Assault and battery are terms of art and are conclusory in nature.  The only facts plead that describe conduct suggesting an assault or battery was that Inmate Vann was dragged down the stairs by Defendants', and that Captain Brown placed Inmate Vann in the restraint chair for several hours", left his hands restraint on too long.  There are neither sufficient facts to describe or illustrate the circumstances surrounding the use of force nor demonstrating that said force was objectively unreasonable under those circumstances.  Inmate Vann's characterization of the events standing alone simply do not rise to the level of a constitutional violation in the face of the aforementioned

cases.  Further, Inmate Vann's characterization of the events viewed considering the evidence in record before the Court demonstrate dismissal or summary judgment in this instance is proper as the Defendants are entitled to qualified immunity.  That coupled with the review of the video and facility reports from several independent and objective officers, who were not a witness or part of the use of force,  determined Inmate Vann's claims to be unfounded and within policy.

At this juncture, Inmate Vann must come forward and identify cases with facts analogous to that within the record and finding that conduct to be unconstitutional.  Specifically, he must find a case that rules that the use of carry technique to remove a very large offender from a cellhouse in order to assess his need for medical assistance, maintain security and restore order violated the Constitution on October 27, 2018.

### 2. Count II - Denial of Medical Care

Inmate Vann asserts the denial of medical care against Deputy Mesler and Captain Brown. In the Second Amended Complaint and in the Pre-Trial Order (Docs. 123 & 175) Inmate Vann only alleges that On October 27, 2018, Captain Shardale Brown denied Plaintiff medical attention after a use of force.  As to Deputy Mesler, Inmate Vann only states that on October 27, 2018 Deputy Mesler denied Plaintiff medical attention and medical assistance.  These averments are conclusory and insufficient to establish a claim for relief, and likewise, counter to the record now before the Court.

The Eighth Amendment protects inmates from "cruel and unusual punishments." U.S. Const. amend. VIII. The primary concern of the drafters was to outlaw torture and other barbarous methods of punishment. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). The Supreme Court has, therefore, concluded that this amendment imposes on the government only minimal

"obligation to provide medical care for those who it is punishing by incarceration" so as to prevent the infliction of wanton suffering as a form of punishment. *Id.* at 103-04. Accordingly, a prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment only if he is deliberately indifferent to an inmate's serious medical needs. *Id.*

To establish that Defendants Brown and Mesler were deliberately indifferent, Inmate Vann must plead and prove both an objective and a subjective element. *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). To establish the objective component, Inmate Vann must show that he suffered a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle*, 429 U.S. at 106. To establish the subjective component, Inmate Vann must show that Defendants Brown and Mesler "kn[ew] of and disregard[ed] an excessive risk to [his] health or safety[.]" *Farmer*, 511 U.S. at 837.

To establish a constitutional violation, the medical condition suffered by an inmate must be "sufficiently serious," such that failure to treat it would rise to the level of a constitutional violation. *See Farmer*, 511 U.S. at 834; *see Estelle*, 429 U.S. at 103-04. A medical need is sufficiently serious if it is "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," or "has been diagnosed by a physician mandating treatment." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

Inmate Vann's claim fails because his condition was not objectively serious. Plaintiff had some history of high blood pressure but at the time of the incident, he had only been in the WCDC for a few days and nothing in his medical screening suggested he had a serious ongoing condition of which these Defendant Mesler or Defendant Brown had notice or were aware of and ignored. (Ex. W)

While Inmate Vann had historically been prescribed medicine for high blood pressure, Defendant Mesler and Brown were not aware of it and likewise were not aware of his regular refusal to take his medication.  In addition, the record shows that when Deputy Mesler was notified by Inmate Vann that he was (claiming) to have chest pains, Deputy Mesler promptly radioed the medical unit for assistance and notified the shift supervisor.  The record reflects that Sergeant Baird also called for medical assistance, and the medical unit responded and acted appropriately.

More importantly, Inmate Vann's medical records and facility documentation conclusively show that during the course of this incarceration, Inmate Vann received timely, regular, and appropriate care and medical treatment from medical professionals.  The day of the alleged denial, Inmate Vann's vitals were checked and were within normal limits (Exhibit W).  Medical personnel timely responded and assessed Inmate Vann and cleared him for movement and placement in the restraint chair.  Throughout his placement in the restraint chair, which was less than two hours, Inmate Vann was monitored in accordance with policy and displayed no distress and no visible injuries were noted.  (Ex. M) The record also indicated that the hand restraints were checked by medical personnel and determined their position was appropriate, not cutting off circulation and no cuts or bleeding or injuries were noted to the hands or wrists.  (Ex. J)

Plaintiff's allegations, when viewed with the undisputed medical records, fail to meet his burden to establish that he had a serious medical need or that the incident on October 27, 2018 and the denial of medical assistance made his condition any worse or provide any factual basis for a finding that his condition was the exacerbated by the use of force or placement in the restraint chair or application of hand restraints. The alleged injury was not "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" as required for an Eighth Amendment claim. *Mata v. Saiz, 427 F.3d 745, 751 (10th Cir. 2005).* Examples of sufficiently

obvious conditions have included visibly necrotizing tissue, *Oxendine v. Kaplan*, 241 F.3d 1272, 1278 (10th Cir. 2001), and a highly symptomatic cardiac event, *Sealock v. Colorado*, 218 F.3d, 1205, 1208 (10th Cir. 2000). Inmate Vann refused to cooperate with medical. The information (vitals) that were able to be collected from him demonstrated that he was having no symptoms to support the claimed emergency or in some kind of need of medical assistance.

Further, Inmate Vann fails to set forth any factual basis for suggesting or finding that Defendants Mesler and Brown acted with the requisite state of mind. *See Farmer*, 511 U.S. at 834. Deliberate indifference requires "a state of mind more blameworthy than negligence" and "more than ordinary lack of due care for the prisoner's interest or safety[.]" *Farmer*, 511 U.S. at 835. To satisfy this element, Plaintiff must prove that these Defendants "knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009) (quoting *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006). In other words, these Defendants cannot be liable under the unless they knew of and disregarded "an excessive risk to [plaintiff's] health or safety"; they must have been not only "aware of facts from which the inference could be drawn that a substantial risk of harm exist[ed]," but must also have *actually drawn the inference*. *Farmer*, 511 U.S. at 838 (observing that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment" in violation of the Eighth Amendment).

Here there is nothing in the Second Amended Complaint or in the record to suggest that Defendants Mesler and Brown knew of any substantial risk of harm to Plaintiff. To the contrary, medical attention was sought for Inmate Vann and Defendants' based the decisions they made relative to input from trained medical staff. There is no evidence to suggest that Defendant Brown

and Mesler should have been aware of any serious medical risk to Inmate Vann.  Even if they were, the did not disregard the risk when they consulted with medical personnel.  There is no reason to think that Defendants should have taken Inmate Vann's word for the alleged severity of his claimed injuries in this situation.  Inmate Vann has failed to demonstrate that Defendants Brown and Mesler subjectively knew of and disregarded a risk of harm to Plaintiff.

The Eighth Amendment does not impose upon government actors a duty to discern unapparent medical needs. Defendants are entitled to qualified immunity and dismissal based upon the allegations or summary judgment based in light of the established facts in the record.

### 3.  *Count III - Denial of Due Process in a Jail Disciplinary Hearing*

Inmate Vann alleges he was denied due process in his disciplinary hearing by Defendant Sara Toms (Toms) in that Toms was the Disciplinary Hearing Officer who presided over disciplinary tickets issued to Inmate Vann on October 27, 2018 and November 1, 2018.  Inmate Vann claims that Toms did not allow Plaintiff to call witnesses in his disciplinary hearings.

In his Second Amended Complaint, Plaintiff appears to claim that he was denied due process in that he had witnesses he wanted to call for his hearings and those witnesses were ultimately not called. Plaintiff does not name those individuals that he claims he was denied and never makes any allegations that he provided those names to Defendant Tom who was conducting the disciplinary hearing. Prison disciplinary hearings are not part of a criminal prosecution and the full panoply of rights due a defendant in such a prosecution do not apply. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The minimum due process requirements for prison disciplinary hearings are: (1) written notice of the charges brought against the inmate at least twenty-four hours before the hearing; (2) the opportunity to call witnesses and present

evidence at the hearing; and (3) a written statement by the factfinder as to the evidence relied upon and the reason for any action taken. *Id*. at 564–66, 94 S.Ct. at 2978–80.

Inmate Vann alleges that because he was not allowed to call a witness and not allowed to present certain evidence, and that Defendant Toms violated the second due process prong. However, Inmate Vann has failed to state facts that he listed or identified witnesses to be called. In addition, Plaintiff has failed to adequately show how the testimony of the officer or the inmate would have affected the outcome of his case. See *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir.), cert. denied, 502 U.S. 827, 112 S.Ct. 97, 116 L.Ed.2d 68 (1991) ("only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment").

In addition, while the affidavit of Toms (Exhibit S) does indicate that Inmate Vann requested witnesses, the name he provided of the inmate witness was not able to be called because no inmate by that name was incarcerated at the WCDC. The staff witnesses he identified were not available at the time of the hearing, but their written reports and video evidence of the event was available for review and the contents thereof provided to Inmate Vann. Toms also Inmate Vann the reasons for her denial. For these reasons, any claims that Inmate Vann was denied the right to call witnesses at his disciplinary hearing or otherwise denied due process should be dismissed or summary judgment granted. Toms is entitled to qualified immunity as her actions followed established policy (Exhibits S, V) and fell within the parameters for due process requirements. *Id.*

### 4. *Count IV – Retaliation*

Inmate Vann alleges he was retaliated against by Warden Fewell, Sara Toms, and Major Charles Patrick. He alleges that Toms sentenced him for indeterminate amount of time in retaliation for Plaintiff filing grievances against her and conspired with other employees to keep

him in segregation to conceal his injuries.  Inmate Vann alleges that Major Patrick housed Plaintiff in segregation for an indeterminate term, placed him in an unfit and unsanitary cell, confiscated Plaintiff's legal work and religious materials, blocked Plaintiff's access to courts, threatened to kill Plaintiff, and falsified documents in order to keep Plaintiff in segregation.  Inmate Vann alleges that Warden Jeffrey Fewell placed Plaintiff in segregation for an indefinite term as retaliation for speaking with a camera crew about his mistreatment at the WCDC, confiscated Plaintiff's legal work, mail, and blocked his access to the Courts, placed in an unfit and unsanitary cell in segregation in retaliation for Inmate Vann's filing of grievances against him.  In addition, he claims Warden Fewell conspired with Sarah Toms and Charles Patrick to keep Plaintiff housed in segregation indeterminately to conceal Inmate Vann's injuries from others and failed to inform Plaintiff of his mother's death which forced him to cremate her contrary to their religious beliefs.

Aside from the somewhat conclusory allegations, these assertions are insufficient to establish a claim of retaliation under Section 1983.  A retaliation claim bears three elements: (1) identification of constitutionally protected activity, (2) conduct "that would chill a person of ordinary firmness from continuing to engage in that activity," and (3) facts indicating that the conduct was intended to respond to the exercise of protected activity. *Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010).  Inmate Vann alleges relation for filing of grievances and speaking to a camera crew by placing him in Segregation.  He fails to specify the time in which this placement occurred, what actions were taken to establish a conspiracy, makes vague and unspecified assertions about the concealment of injuries without any context or reference to what injuries he sustained and by whom and when.  He also fails to specific when his interview with the camera crew occurred or what news or media outlet he spoke with.  Inmate Vann alleges additional egregious conduct such as failing to notify him of his mother's death, blocking his access to courts

(without specific facts to demonstrate how) and so forth.  But none of these conclusory allegations meet the tests annunciated in *Gee.*

The first element involves a protected activity.  There is no established constitutional right to file a grievance system in prison and inmates have no constitutional right to a grievance process.  See *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) (stating prison grievance procedures are not required by the first amendment and do not create interests protected by the due-process clause); *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) (stating state-created inmate grievance procedures do not give rise to liberty interests protected by the due-process clause).  In addition, "Prison officials have broad administrative and discretionary authority over the institutions they manage, and lawfully incarcerated persons retain only a narrow range of protected liberty interests.  Administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration and does not involve an interest independently protected by the Due Process Clause." *Hewitt v. Helms*, 459 U.S. 460 (1983).

The second element is conduct that would inhibit continued pursuit of that right.  Inmate Vann does not allege anything that would suggest the that conduct complained of inhibited or chilled the exercise of any recognized right.  Finally, Inmate Vann has failed meet the third element because he has not adequately plead facts explaining each defendant's substantial motivation to retaliate for protected conduct and fails to assert facts to connect the conduct to the exercise of the protected activity.

Pleading deficiencies aside, the record establishes the basis for Inmate Vann's placement was disciplinary in nature was not in fact indeterminate but fixed, by the policy, and was in response to disciplinary infractions committed by Inmate Vann.  The placement in Segregation complied with policy and due process requirements as discussed above under Count III.  Warden

Various staff members participated in periodic segregation reviews of Inmate Vann who was only incarcerated on Booking No.: 2018007606 for approximately ninety (90) days and the record reflects that he was release early from his disciplinary time sentence prior to his release.  (Ex. S, U,V).

With respect to Defendant Reid, Inmate Vann makes no mention of her in the Second Amended Petition, and he provides no context as to the date and times of his allegations.  Even so, assuming that the inclusion of these facts in the Pre-Trial order is sufficient to escape this defect, the records clearly reflect, with multiple witnesses, that Defendant Reid assisted with providing meal service to Inmate Vann, which he on occasion refused due to his hunger strike, and Inmate Vann had regular access to food trays, showers, clean clothing, hygiene and recreation time while in segregation.  In addition, he has not stated any facts to explain any semblance of Deputy Reid's motivation to retaliate.

### 5. Count V - Supervisory Liability

Inmate Vann advances claims against Captain Brown and Undersheriff Larry Roland for supervisory liability.  Section 1983 "does not authorize liability under a theory of respondeat superior."  "Simply put, there's no special rule of [individual capacity] liability for supervisors. The test for them is the same as the test for everyone else."  Thus, to succeed on a § 1983 claim against a defendant-supervisor, the plaintiff must demonstrate: (1) personal involvement, (2) causation, and (3) a culpable state of mind equal to that required to establish the underlying constitutional violation.

With respect to Captain Brown, Inmate Vann alleges she supervised the use of force on October 26, 2018.  The allegations of personal involvement are insufficient for the reasons discussed above in Count I.  In addition, the record clearly shows that Captain Brown only

observed the use of force, did not physically touch Inmate Vann, and that Sergeant Baird was in charge, and determined that the use of force was within policy and appropriate to the circumstances.  Either way, the plaintiff "must show an 'affirmative link' between the supervisor and the constitutional violation." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767, 769 (10th Cir. 2013) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010)) Simply being there, is not enough.  This link can be established by showing "the [supervisor] promulgated, created, implemented[,] or possessed responsibility for the continued operation of a policy, or the establishment or utilization of an unconstitutional policy or custom, provided the policy or custom resulted in a violation of the plaintiff's constitutional rights." *Burke v. Regalado,* 935 F.3d 960 (10th Cir. 2019).

Nothing about claims relative to Captain Brown is sufficient to meet this causation requirement or demonstrate a culpable state of mind.  Likewise, the established record demonstrates facts to the contrary.  Inmate Vann and the record present no facts from which a jury could infer that Defendant Brown knowingly created a substantial risk of injury.

With respect of Undersheriff Roland, the only facts asserted against him is that he failed to address Plaintiff's complaints and grievances and implement preventative measures.  The law on this issue is resolved in that supervisory liability cannot lie simply for failure to answer grievances or answer them in a manner in which the Plaintiff does not agree with.  The Tenth Circuit has held the denial of grievances alone is insufficient to establish personal participation in alleged constitutional violations. *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir.2009); see also *Allen v. Reynolds*, 475 Fed. Appx. 280, 284 (10th Cir. 2012) (notice of dispute given to prison warden does not show his personal participation in unconstitutional conduct).

The remaining statements are against Undersheriff Roland are too conclusory. There is no description of what preventative measures would have prevented the alleged unspecified harms. There is nothing is the record to demonstrate any level of personal participation or that connects the harms alleged by Inmate Vann to Undersheriff Roland. The record reflects that Undersheriff Roland reviewed the records after the use of force on October 27, 2018 and found Inmate Vann's claims of excess force to be unfounded.

Both Captain Brown, and Undersheriff Roland are entitled to dismissal or judgment in their favor on these claims as they are entitled to qualified immunity. (Ex. I)

### Count VI – Discrimination Based on Race

The last claim Inmate Vann alleges is again against Sara Toms. Inmate claims Toms sentenced him to harsher segregation time based on this race. To establish a claim, Inmate Vann must describe conduct that occurred under state law and this conduct deprived him of privileges, rights and immunities under the U.S. Constitution or Federal law.

In addition to the arguments and facts presented in Count III and IV above, there is no actual dispute that Toms followed the disciplinary policy and sentenced Inmate Vann accordingly. Vann makes no allegations that this policy is unconstitutional on its face, which leaves only the potentiality of a disparate impact claim. However, this type of claim has not been brought successfully in the context of prison litigation and there do not appear to be any cases directly on point with analogous facts such that would deny Toms qualified immunity.

The Supreme Court has repeatedly held that Title VI regulations validly prohibit practices having a discriminatory effect on protected groups, even if the actions or practices are not intentionally discriminatory. *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 643 (1983) (Stevens, J., dissenting) (citing *Lau*, 414 U.S. at 568, 571 (Stewart, J., concurring) and *Fullilove*

*v. Klutznick*, 448 U.S. 448, 479 (1980) (opinion of Burger, C.J.)); *Alexander v. Choate*, 469 U.S. 287, 293 (1985)).  However, disparate impact claims cannot be brought pursuant to Section 1983 and do no create a private cause of action or allow private lawsuits based on disparate impact. *Alexander v. Sandoval*, 532 U.S. 275 (2001).

Assuming arguendo that Inmate Vann could make such a claim under Section 1983, not only does he fail to plead facts to support such a claim.  These generic statements by Inmate Vann fail to identify the policy or practice as issue, fail to demonstrate or establish adversity/harm, fail to establish  through facts significant disparity and establish causation.  Aside from those deficiencies, qualified immunity has been asserted throughout this cause on behalf of all defendants.  Toms followed the policy and even provided statistics relative to imposition of segregation relative to those claims demonstrating consistent application in the numbers. Dismissal or judgment in her favor should be granted as she is entitled to qualified immunity.

## CONCLUSION

Inmate Vann was booked into the WCDC on October 26, 2018, as Booking # 2018007606 and released on January 24, 2019.  On October 27, 2018, he attempted to incite a riot and create disruption within the cell house by yelling and kicking on his cell door and urging other inmates to join in the chaos.  At some point during the disturbance, Inmate Vann faked a medical illness and asked for medical attention which was promptly provided.  Inmate Vann's vitals were taken and were within normal range.  Inmate Vann refused to further cooperate with WCDC and medical staff to transport him to medical and he had to be carried out of his room and into the cellhouse dayroom using a five man carry technique.  Inmate Vann was not injured during this transport, and the maneuver was necessary and reasonable for his own health and safety as well as to secure the

facility and restore order.  The incident was reviewed by Command Staff and determined to be appropriate under the circumstances and within policy and procedure.

Once it was determined that Inmate Vann was not in need of medical treatment, he was placed in a restraint chair and transported to intake where he was placed in a secure cell for a short period to calm down and until he could be moved to the segregation unit.  Within a week while in segregation, he attempted the same coup again, and was issued an additional two disciplinary citations.

Inmate Vann received a total of seven staff tickets during this incarceration period.  He received the legal required written notice of the charges, was given the opportunity to call witnesses and the denials were reasonable, and present evidence in his defense.  His sentences were in the range and consistent with other inmates who had received the same charges, and he was released from segregation early on an early release agreement that he requested and agreed too.  Plaintiff was given appropriate medical care and offered regular meal service which he at times refused, due to his self-imposed hunger strike.  The cells to which Inmate Vann was assigned were cleaned regularly and maintained properly and he was given regular and reasonable opportunities to shower. Inmate Vann received all services available through Programs including mail service that he requested and his mail was processed timely and in accordance with policy and procedures. Inmate Vann did not follow all all the steps to exhaust his administrative remedies before filing suit as required by law and even if he did, this case should be dismissed as the facts alleged are insufficient to maintain any cause of action, and even if sufficient, the record reflects that the Defendants are entitled and protected from individual liability under the doctrine of qualified immunity.

Respectfully Submitted,

/s/_____Joni Cole_____
**Joni Cole, KBN 24798**
710 N. 7th Street
Kansas City, Kansas 66101
Ph:  913-573-5069
Email: jscole@wycokck.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September, 2024, the foregoing was filed
with the clerk of the court by using the CM/ECF system which will generate a notice of
electronic filing to parties of record, and that a hard copy of the same was served via inter-
facility mail to Plaintiff at:

Durayl Tyree Vann
Wyandotte County Detention Center, F-19
710 N. 7th Street
Kansas City, Kansas 66101

/s/_____Joni Cole_____
**Attorney for Defendants**