## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DURAYL TYREE VANN,

     Plaintiff,

     v.

JEFFREY FEWELL, et al.,

     Defendants.

Case No. 20-3200-JAR-GEB

## MEMORANDUM AND ORDER

Plaintiff Durayl Tyree Vann, proceeding pro se and in forma pauperis, alleges civil rights claims under 42 U.S.C. § 1983 arising out of his detention at the Wyandotte County, Kansas Jail ("WCJ").  The remaining Defendants in this matter are WCJ Warden Jeffrey Fewell, Deputy Kimberly Reid, Deputy Abraham Mesler, Deputy John Lobner, Deputy Ryan Schuler, Major Charles Patrick, Disciplinary Hearing Officer Sarah Toms, and Undersheriff Larry Roland.[1] Before the Court are Defendants' Motion for Summary Judgment or Alternative Motion to Dismiss (Doc. 176) and Plaintiff's Motion to Treat Verified Amended Complaints I and II as Part of the Summary Judgment Record (Doc. 188).  The motions have been fully briefed, and the Court has considered Plaintiff's many filings in support of his opposition to summary judgment.[2] For the reasons explained below, the Court grants in part and denies in part Plaintiff's motion to rely on his pleadings to oppose summary judgment, and grants Defendants' motion for summary judgment.

---

[1] The Court dismissed Plaintiff's claims against Defendant Shardale Brown as untimely on January 10, 2025.  Doc. 199.

[2] Doc. 179 (Matthew Charles Schlobohm Declaration); Doc. 185 (Bruce Tyner Declaration); Doc. 186 (Vann Declaration); Doc. 191 (Response).

## I.  Legal Standards

Defendants move to dismiss, or in the alternative, for summary judgment.  Because Defendants' motion largely relies on matters outside the pleadings, and because Plaintiff was provided with notice of his obligations under the summary judgment standard,[3] the Court applies the summary judgment standard in deciding this motion.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[4]  In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[5]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[6]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[7]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[8]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[9]  Once the movant has met the initial burden of

---

[3] *See, e.g.*, *Marquez v. Cable One, Inc.*, 463 F.3d 1118, 1121 (10th Cir. 2006) (finding sufficient notice where the motion for summary judgment is raised in the alternative); *see also* Doc. 178 (Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment).

[4] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[5] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[6] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[7] *Wright ex rel. Tr. Co. of Kan. v. Abbott Lab'ies, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[8] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[9] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[10]

The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[11] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[12] In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[13] A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[14] In responding to a motion for summary judgment, a party cannot rest on "ignorance of the facts, on speculation, or on suspicion" to escape summary judgment.[15]

Where, on the other hand, the movant seeks summary judgment on its own affirmative defense—on which it will bear the burden of persuasion at trial—the defendant must "demonstrate that no disputed material fact exists regarding the affirmative defense asserted."[16] And that showing must be sufficient to "entitle [the movant] to a directed verdict if not

---

[10] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[11] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[12] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[13] *Adler*, 144 F.3d at 671.

[14] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[15] *Genzer v. James River Ins.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)).

[16] *Estrada v. Smart*, 107 F.4th 1254, 1261 (10th Cir. 2024) (quoting *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997)). As discussed later in this opinion, this standard is modified when the defense of qualified immunity is invoked because the burden is on Plaintiff.

controverted" at trial.[17]  Once the defendant makes this initial showing, "the plaintiff must then demonstrate with specificity the existence of a disputed material fact."[18]  If the plaintiff cannot meet this burden, "the affirmative defense bars his claim, and the defendant is then entitled to summary judgment as a matter of law."[19]

In deciding this motion, the Court is mindful that Plaintiff proceeds pro se; therefore, the Court must construe his pleadings liberally.[20]  However, pro se plaintiffs may not rely on conclusory allegations to overcome their burden to establish that a general issue of material fact exists.[21]  The Court cannot assume the role of advocate,[22] nor can the Court "supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf."[23]

## II.  Plaintiff's Submissions

### A.  Plaintiff's Failure to Follow the Local Rules

Plaintiff submitted several filings in opposition to Defendants' summary judgment motion, including two—a declaration and a response brief—that together comprise well over 100 pages of single-spaced content.  He separately attached a 34-page Statement of Disputed Factual Issues to his declaration.[24]  These filings do not comply with the Court's local rules for summary

---

[17] *Brown v. Perez*, 835 F.3d 1223, 1231 (10th Cir. 2016); *see also Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (noting that party's showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party").

[18] *Hutchinson*, 105 F.3d at 564.

[19] *Id.*

[20] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[21] *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002).

[22] *Hall*, 935 F.2d at 1110.

[23] *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997).

[24] Doc. 186-1.

judgment responses, which contemplate one responsive brief, not to exceed 40 pages in length.[25] In fact, there were so many separate filings that Defendants were unclear which document to treat as Plaintiff's operative response to the summary judgment motion, necessitating a Court order.[26] As the Court previously explained, the response brief itself violated the Court's 40-page limit for briefs in opposition to summary judgment, which Plaintiff filed before obtaining leave of court to exceed the page limit. Plaintiff was provided notice of the local rule governing summary judgment practice and even though he proceeds pro se, he is expected to follow the Court's rules of procedure.[27] Despite Plaintiff's failure to abide by the Court's local rules, out of an abundance of caution, the Court has considered Plaintiff's many voluminous filings in resolving Defendants' summary judgment motion.

### B. Plaintiff's Motion to Treat Verified Amended Complaints I and II as Part of the Summary Judgment Record

Plaintiff asks the Court in a separate motion to treat certain paragraphs in his first two complaints as part of the summary judgment record. As described in the preceding section, at the summary judgment stage, Plaintiff can no longer rest on his allegations in the pleadings to controvert facts that Defendant supports with deposition testimony, affidavits, or other record evidence. Plaintiff, as the nonmoving party, must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for" him."[28] Factual allegations, as opposed to evidence, do not suffice at the summary judgment

---

[25] *See* D. Kan. Rule 7.1.

[26] *See* Doc. 193 (resolving parties' motions on this issue and determining that Plaintiff's October 21, 2024 responsive filing was the operative response brief).

[27] *Smith v. Jones*, 606 F. App'x 899, 901 (10th Cir. 2015); *Smith v. Hollinghead*, No. 20-3179-SAC, 2022 WL 2355401, at *2 (D. Kan. June 30, 2022).

[28] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

stage.[29]  Thus, to the extent Plaintiff seeks to rely on his pleadings to dispute Defendants' factual averments that are supported with record evidence, his motion is denied.[30]

Moreover, the Second Amended Complaint is the operative pleading in this matter; it replaced and rendered moot the Amended Complaint.  And importantly, the Pretrial Order entered on August 30, 2024, supersedes the pleadings[31] and "controls the course of the action unless the court modifies it."[32]  "Claims, issues, defenses, or theories of damages not included in the pretrial order are waived."[33]  It is true that the Pretrial Order should be "'liberally construed to cover any of the legal or factual theories that might be embraced by [its] language.'  But the primary purpose of pretrial orders is to avoid surprise by requiring parties to 'fully and fairly disclose their views as to what the real issues of the trial will be.'"[34]  Therefore, while the Court will consider Plaintiff's allegations in the Second Amended Complaint to the limited extent they are based on his personal knowledge and not controverted by Defendants' record evidence, the Pretrial Order defines the claims and legal theories that remain in this matter.

### C.      Defendants' Objections to Plaintiff's Exhibits

Plaintiff submitted several filings in support of his opposition to Defendants' summary judgment motion that Defendants move to exclude or strike: (1) Inmate Grievance Form Exhibits

---

[29] *Sanchez v. Guzman*, 105 F.4th 1285, 1299 (10th Cir. 2024), *cert. denied*, No. 24-463, 2025 WL 76459 (U.S. Jan. 13, 2025) ("[I]n the summary-judgment context. . . . the plaintiff cannot rest on her well-pleaded factual averments; rather, the plaintiff must point to record evidence supportive of the plaintiff's position; this means that, though ordinarily the court accepts plaintiff's version of the facts as the starting point for the legal analysis, that version will be cognizable only if it is supported by record evidence.").

[30] The Court relies on Plaintiff's own lengthy declaration as evidence in support of his version of the facts to the extent it is based on his personal knowledge.  Doc. 186.

[31] *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002).

[32] Fed. R. Civ. P. 16(d).

[33] *Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).

[34] *Id.* (first quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979); and then quoting *Cortez*, 460 F.3d at 1276).

filed on September 19, 2024;[35] (2) Affidavit of Bruce Tyner;[36] and (3) Plaintiff's Declaration in Opposition to Defendant's Motion for Summary Judgment, and attached Exhibits.[37] Summary judgment evidence need not be "submitted 'in a form that would be admissible at trial.'"[38] "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."[39]

Defendants argue that the inmate grievance forms are not material because they address incidents that are not part of the claims in this case. The Court agrees. These grievance forms were submitted to the WCJ in August 2024, well after the detention in 2018–2019 during which the claims in this case arose.

Bruce Tyner states in his notarized affidavit that he was housed in the same pod with Plaintiff on October 27, 2018, describes what happened in the pod that evening, and relays several statements made to him by Plaintiff. Tyner also offers his opinion about whether Plaintiff deserved certain treatment by the officers. Defendants move to exclude the Tyner Affidavit because it is not presented in a form that would be admissible at trial—it lacks foundation and contains inadmissible hearsay, inadmissible opinion testimony, speculation, and conjecture. Under Fed. R. Evid. 602, evidence must be excluded that is not based on the witness's personal knowledge. Here, the bulk of Tyner's affidavit is based on what he personally witnessed on October 27, 2018 in F-Pod, so Defendants' foundation objection is overruled. The statements about what Plaintiff told him, however, are inadmissible hearsay for

---

[35] Doc. 181.

[36] Doc. 185.

[37] Doc. 186.

[38] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[39] *Id.* (quoting 11 James Wm. Moore et al., Moore's Federal Practice–Civil § 56.91 (3d ed. 2015)).

which no exception appears to apply.[40]  Tyner's statements about whether Plaintiff deserved

certain treatment, or whether he was in fact having a medical emergency are inadmissible

opinions that are not within his personal knowledge or expertise.[41]  The Court will consider the

affidavit to the extent Tyner describes what he witnessed (as opposed to what he heard), on

October 27, 2018.

Finally, Defendants move to exclude Plaintiff's declaration to the extent it includes

conclusory allegations, statements that lack foundation, inadmissible hearsay, speculation, and

conjecture.  Plaintiff's declaration is lengthy and the Court will not parse through it to render

specific rulings about each specific statement he makes.  But the Court does not consider any

statements for which Plaintiff lacks personal knowledge, that contain inadmissible hearsay, or

that are purely conclusory.

## III.    Uncontroverted Facts

With the above rulings in mind, the following material facts are uncontroverted or viewed

in the light most favorable to Plaintiff.[42]  In addition to the parties' summary judgment

submissions, the Court considers Exhibit A to the *Martinez* Report, which is video footage of the

incident on October 27, 2018, from several different body cameras.[43]  Defendants refer to the

videos in their motion, and they capture the events that give rise to Plaintiff's excessive force and

deliberate indifference claims.

---

[40] *See* Fed. R. Evid. 801, 802, 803.

[41] *See* Fed. R. Evid. 602, 701.

[42] Plaintiff fails to specifically controvert many of Defendants' statements of fact as required by Fed. R. Civ. P. 56(c)(1) and D. Kan. Rule 56.1, even when construing Plaintiff's additional statements of fact in his many filings.  To the extent Defendants' facts are material and supported by the record, the Court deems them undisputed. Fed. R. Civ. P. 56(e)(2).

[43] Doc. 35 (filed conventionally).

Plaintiff Durayl Vann was booked into the WCJ on October 26, 2018, and was released on January 24, 2019. He has an extensive incarceration and disciplinary history at the WCJ.[44] His disciplinary history includes, *inter alia*, creating disturbances, inciting a group demonstration, and malingering or faking an illness.

According to WCJ records, Plaintiff had been diagnosed with and regularly treated for hypertension and joint pain but showed no signs of any other symptoms or diagnoses during his detention. Plaintiff was prescribed medication to treat his high blood pressure, which he was instructed to take once daily, but regularly refused to do. During his October 2018–January 2019 detention, Plaintiff was seen by medical staff ("Medical") approximately 26 times. Jail records reflect he was provided regular meal service three times daily.

In late October and early November 2018, Plaintiff went on a hunger strike for 9 days. On November 2, 2018, Plaintiff was placed on suicide watch and transferred to the infirmary. Medical monitored Plaintiff during his hunger strike and made arrangements for him to have double portions of meals after, which he accepted. Medical also provided him with mental health services.

Between November 5, 2018 and January 18, 2019, Plaintiff was assigned to B-pod, where he served his disciplinary segregation. After a period of good behavior, he was returned back to the general population on January 18, 2019, a few days before his release on January 24, 2019.

---

[44] *See, e.g.*, Doc. 177-20 ¶ 38 (listing Plaintiff's inmate disciplinary and booking history, which includes 18 separate detentions between 2012 and 2020, and 23 separate WCJ rule violations between 2015 and 2019).

### *October 27–28, 2018 Excessive Force and Medical Incident*

On October 27, 2018, at 9:07 a.m., Plaintiff was transferred to an F-Pod cell. Deputy Abraham Mesler was assigned to the F-Pod that night. While Mesler was conducting scheduled pod checks at approximately 7:45 p.m., Plaintiff asked for a paper Inmate Communication Form ("ICF"). Mesler informed Plaintiff that F-Pod did not have any paper forms and that he would have to submit his request electronically at a kiosk.

Plaintiff began yelling loudly through his door demanding a paper ICF at the rest of the inmates in F-Pod and then began kicking at his door. Other inmates responded to Plaintiff and began joining in by yelling loudly, kicking their doors, and demanding paper ICFs. This disturbance lasted for approximately one hour, with Plaintiff leading the other inmates in loud and indiscernible yelling with violent pounding on their cell doors. Plaintiff maintains that at some point he started having chest pains and tried to get the attention of the officers and obtain medical attention. Bruce Tyner, who was detained in the cell next to Plaintiff, talked with him by their adjoining wall and offered Plaintiff one of his extra ICF forms. He noticed that Plaintiff was slurring his words and believed he was having medical issues.

Mesler called Acting Sergeant John Lobner at 8:53 p.m. for advice. Mesler and Lobner determined that Plaintiff was attempting to control the rest of the pod by his continued behavior, and that the appropriate course of action was not to accede to his demands. At this point, Mesler set his bodycam on the countertop at the bottom of the stairs and began recording. At 9:05 p.m., Plaintiff informed Mesler that he was having chest pains, but Mesler perceived no signs of physical distress. Mesler completed the pod check and called Medical to report Plaintiff's chest pains. Medical arrived to conduct a medication pass at 9:34 p.m., but could not proceed to dispense medication for nearly 40 minutes because of the disturbance in the pod.

Several deputies attest that at approximately 9:45 p.m., Plaintiff was still creating a disturbance by kicking and yelling, beating on his cell door, and commanding others in F-Pod to do the same. At this point, Acting Captain Shardale Brown, Acting Sergeant Devin Baird, Lobner, Schuler, and two other deputies arrived at F-pod and eventually removed Plaintiff from his cell. Baird was in command of the incident.

Video footage shows the officers enter Plaintiff's cell and observe him lying on the floor still. WCJ staff place leg restraints on Plaintiff as a precaution. Lobner performs a sternum rub, at which point Plaintiff becomes responsive and tells them he is having chest pains and demands to speak to Medical. Plaintiff again shouts to the other inmates that the officers are refusing to contact Medical. When Medical arrives, Plaintiff continues to shout and is uncooperative with the nurse's efforts to check his vital signs. The officers repeatedly implore Plaintiff to cooperate so that they can help him. Medical was not able to take all of his vital signs as a result of his failure to cooperate, although the nurse was able to take Plaintiff's blood pressure, which was within normal range. The nurse recommends that the officers take Plaintiff to the medical clinic for further testing. But Plaintiff does not stand up when asked, and when the officers try to get him to his feet to move him to a wheelchair, he becomes "dead weight."

In the footage of the incident, Plaintiff is uncooperative, yelling, demanding a different nurse, calling the current nurse "stupid" and "an imbecile" and yelling that they "sent him the B team." When Plaintiff refuses to walk to the wheel chair, staff decided that due to his size and strength, they should lay him on his stomach and cuff him at the wrists from behind before carrying him down the stairs using a "five man carry" technique to transport him down the stairs to the lower level of the pod. Plaintiff resists during their attempts to move the hand restraints to his back. One officer says to "watch his hair" while they are carrying him. According to the

officers, this five-man carry technique is trained and taught by law enforcement agencies in Kansas and they determined it was appropriate based on that training under these circumstances.

When staff attempts to talk to Plaintiff, he continues to scream, telling them they are "a piece of shit," he is going to have a field day with this, and that this is a civil suit waiting to happen. Plaintiff yells out to the other inmates, triggering them to yell and kick their doors. Once at the bottom of the stairs, staff repeatedly implore Plaintiff to calm down so that they can place him in a wheelchair. Instead, Plaintiff continues to yell and incite other inmates in the pod, and twists his body. Due to Plaintiff's resistant behavior, the deputies next retrieved a restraint chair and secured Plaintiff in it at 9:58 p.m. It was placed in the intake area for monitoring.

According to the Restraint Chair Monitoring Log, Plaintiff was monitored at 30-minute intervals for approximately two hours. Medical checked and cleared all restraints and straps for proper fit, ensuring that they did not cut off circulation and that there were no cuts or bleeding or injuries to Plaintiff's hands or wrists. Plaintiff was taken to another cell for housing at 12:10 a.m. on October 28, after being evaluated by medical staff again. He was given new bedding, clothes, and towels, as he had urinated on himself while in the restraint chair. The deputies removed the leg and hand restraints at this point with no further incident. The entire pod remained on lockdown through the next day and the inmates in the pod lost their tablet privileges for that day.

After Plaintiff filed a complaint with the WCJ about the October 27–28, 2018 incident, the jail conducted a three-part internal review by staff who reviewed the body camera footage of the incident. First, Captain Andrew Carver reviewed the footage and found that Plaintiff's claims of being beaten, dragged down stairs, and denied medical treatment were not supported by the footage. Next, Major John Russell reviewed the footage and found the claims to be

unfounded.  Finally, Undersheriff Roland reviewed the complaint and found the allegations were unfounded.

### *Disciplinary Violation, Hearing, and Discipline*

WCJ's disciplinary process includes several methods designed to maintain control of housing areas and encourage compliance with WCJ's rules.  Those rules are provided to detainees through a published Inmate Orientation, Guidelines, and Rules sheet at the time of booking.  It is also available in the housing units, on the kiosks, and on inmate tablets.  Plaintiff was provided with a paper copy of this document.

WCJ policy allows for the following discipline for detainee conduct that violates WCJ rules of conduct: (1) verbal correction; (2) 23-hour lockdowns; and (3) loss of recreation time or commissary.  More serious violations require a formal disciplinary hearing, which allows an appeal to a higher authority.  Penalties after a guilty finding in a disciplinary hearing include extending the time of incarceration, extended periods of punitive isolation, or referral to classification officials for a reassessment of the detainee's classification status.  To effectively manage inmate behavior, both formal and informal discipline are consistently carried out so that the inmates and the staff see the process as fairly implemented.

Defendant Sara Toms, a civilian employee, served as the Disciplinary Hearing Officer ("DHO") at the WCJ and presided over the disciplinary tickets issued to Plaintiff during the time period in question.  Disciplinary Hearings at the WCJ are governed by policy F-185.  They are regularly conducted by one person, on a consistent basis, who is trained in conducting due process hearings.  Toms had been conducting these hearings since 2017.

The assigned DHO is not present during the incident that led to the detainee's ticket; instead, the DHO reviews the written and video evidence after the occurrence, during the hearing

process.  The disciplinary hearing office operates under the basis of "preponderance of the evidence" which means that an inmate may be found guilty when anything over 50% of the evidence indicates guilt.  If the DHO is convinced that it is more likely than not that the inmate is guilty, the preponderance of the evidence standard has been met.

During Plaintiff's October 26, 2018 to January 24, 2019 detention, he received five staff tickets on October 27, 2018 and two staff tickets on November 1, 2018.  Plaintiff was provided with written statements of the charges within 24 hours, and more than 24 hours before the scheduled disciplinary hearings, as required by WCJ policy.

The first hearing was based on Plaintiff's October 27, 2018 violations: (1) inciting and encouraging a group demonstration; (2) conduct that disrupts, disturbs, or interferes with the security or orderly operations; (3) interfering with the rights or privileges of other inmates; (4) malingering or faking an illness; and (5) disrespect towards, lying to, and/or harassing an employee.  On the Notice of Disciplinary Hearing form, Plaintiff requested that another detainee, Jamaal Lewis, represent him, and asked that "Bruce Tyren F-43" testify as a witness.  He also listed the names of the officers who were present during the October 27 incident, but none of them were on duty or available to testify at the time of his hearing.

The hearing took place on October 30, 2018, at 12:10 p.m.  It was recorded by a body camera at Plaintiff's request.[45]  Plaintiff's request for assistance from another inmate was denied for failure to meet the criteria, and staff could not locate a detainee named Bruce Tyren at the facility.  Toms considered the following evidence: narrative reports written by sworn security staff and medical staff, body camera footage/recordings of the incident, footage/recordings

---

[45] This video is not part of the record.

obtained from the housing unit security cameras, and Plaintiff's own statements at the hearing.[46]

The malingering violation was dismissed, but Toms determined that Plaintiff was guilty of the

other violations, and imposed separate sanctions for each of the four violations. She sanctioned

Plaintiff to a total of 82 days of disciplinary segregation with credit for time served.[47] Toms was

not aware of any injuries to Plaintiff during his period of detention at the WCJ and had no access

to his medical records. She is also unaware of any grievance by Plaintiff that names her.

Toms provided Plaintiff with written results of her decision after the hearing. He was

advised of his right to appeal in person and in writing, and given an appeal form. There is no

record of Plaintiff using the appeal form to appeal this decision; however, he did submit a

grievance form attempting to appeal it. Patrick responded that he "reviewed the cameras and the

discipline is upheld."[48] Plaintiff attempted to appeal on a grievance form again "up the higher

chain of command," and Fewell responded that the appeal was received and denied.[49]

The second hearing was based on Plaintiff's November 1, 2018 violations for

malingering and faking an illness, and for creating a disturbance. Plaintiff refused to sign the

written notice of these violations, and he did not request that any additional witnesses appear at

the hearing on November 2, 2018. Toms reviewed the narrative reports, medical incident

reports, and body camera video, found Plaintiff guilty of the violations, and imposed a sanction

---

[46] According to the decision, Plaintiff "stated that he told the other inmates to 'bear witness to what they were doing' to him and admitted saying to the Nurse that he was lazy and inadequate." Doc. 177-21 at 3.

[47] WCJ policy allowed for a maximum period of segregation of 30 days for each violation. Doc. 177-23, Part III.F.2.g. Toms' sanctions did not exceed this limit on any one violation; they were ordered to be served consecutively. She imposed a sanction of 15 days for engaging in or encouraging a group demonstration, 30 days for interfering with the rights or privileges of other inmates, 30 days for creating a disturbance which requires the removal of the inmate from the area to restore order, and seven days for disrespect towards an employee. Doc. 177-21 at 3.

[48] Doc. 186-4 at 43.

[49] *Id.* at 44.

of seven days disciplinary segregation to be served consecutive to the sanctions imposed on the October 27 violations. Again, Plaintiff was provided with an appeal form but did not appeal the decision.

WCJ statistics from 2018 and 2019 on the discipline imposed for the specific violations Plaintiff was charged with are as follows:[50]

- **Inciting or Encouraging a Group Demonstration**: 3 tickets in 2018, of which all three were given a 15-day disciplinary segregation sanction; 2 tickets issued in 2019, one of which was dismissed and the other was given a 30-day disciplinary segregation sanction.

- **Conduct which Disrupts, Disturbs, or Interferes with the Security of Orderly Operations**: 99 tickets in 2018, of which 19 were dismissed and 18 were given a 30-day disciplinary segregation sanction; 189 tickets issued in 2019, of which 24 were dismissed, 51 received 14 days or less of disciplinary segregation, 98 received 15 or more days of disciplinary segregation, 2 were found not guilty, and 2 received a loss-of-privileges sanction.

- **Interfering with the Rights or Privileges of Other Inmates**: 15 tickets in 2018, of which 2 were given a 30-day sanction; 24 tickets in 2019, of which 6 were dismissed, 10 received 14 days or less of disciplinary segregation, and 7 received 15 or more days of disciplinary segregation.

- **Malingering or Faking an Illness**: 20 tickets in 2018, of which 6 were dismissed, 6 were given 4 or less days of disciplinary segregation, 6 were given 5

---

[50] There were approximately 130 incidents in 2018 and 55 incidents in 2019 that resulted in multiple tickets being issued to one inmate.

or more days of disciplinary segregation, 1 was sanctioned to a loss of privileges, and 1 had an undocumented outcome; 19 tickets in 2019, of which 4 were dismissed, 7 were given 4 or less days of disciplinary segregation, and 8 were given 5 or more days of disciplinary segregation.

- **Disrespect Towards, Lying to, and/or Harassing an Employee**: 58 tickets in 2018, of which 3 were dismissed, 4 were sanctioned to a loss of privileges, 16 were given 4 or less days of disciplinary segregation, and 35 were given 5 or more days of disciplinary segregation; 32 tickets in 2019, 7 of which were dismissed, 1 was sanctioned to a loss of privileges, 3 were given 4 or less days of disciplinary segregation, and 21 were given 5 or more days of disciplinary segregation.

- **Creating a Minor Disturbance**: 11 tickets in 2018, two of which were dismissed and the rest were given 5 or more days of disciplinary segregation; 3 tickets in 2019, of which 1 received 4 or less days of disciplinary segregation, and the other two were given 5 or more days of disciplinary segregation.[51]

Plaintiff's segregation status was reviewed by the Special Management team on a weekly basis. These meetings included Major Patrick and Warden Fewell and several other members. Security memos pertaining to his segregation were updated regularly and as needed. Plaintiff received monthly notice of his status review by the Special Management team.

Plaintiff was moved back into the general population on January 18, 2019, and was released on January 24, 2019. WCJ records show that he was consistently provided with food;

---

[51] *See* Doc. 177-20 ¶ 41.

medical, dental, and behavioral health services; regular opportunities to shower and clean his room;[52] and regular access to mail services.[53]

## IV.    Discussion

The Pretrial Order states that the following six individual-capacity claims under § 1983 remain: (1) excessive force against Lobner and Schuler; (2) deliberate indifference to serious medical needs against Mesler; (3) denial of due process against Toms, Patrick, and Fewell; (4) retaliation against Toms, Patrick, Reid, and Fewell; (5) race discrimination against Toms; and (6) supervisory liability against Roland and Fewell. Defendants move for summary judgment on the remaining claims in this case based on failure to exhaust and qualified immunity. The Court first considers Defendants' exhaustion defense, and then turns to qualified immunity.

### A.    Administrative Exhaustion

Defendants first argue that summary judgment is warranted because Plaintiff failed to administratively exhaust his claims. Plaintiff responds that he fulfilled the total exhaustion rule for each of his claims, but asserts that his grievances were often not responded to. The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."[54] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or

---

[52] Docs. 177-15, 177-16, 177-17, 177-18, 177-19 (Officer Log Reports during the period of Plaintiff's detention).

[53] Doc. 177-27 (showing 15 mail deliveries to Plaintiff between October 31, 2018 and January 22, 2019).

[54] 42 U.S.C. § 1997e(a).

some other wrong."[55] Failure to exhaust is an affirmative defense; therefore, Defendants bear the burden of pleading it and demonstrating that it applies.[56]

"[A]n inmate may only exhaust by properly following all of the steps laid out in the prison system's grievance procedure."[57] Even if the inmate begins the grievance procedure, if he does not complete it, he is barred from pursuing relief under § 1983.[58] The exhaustion requirement is not left to the district court's discretion but rather is mandatory, with one qualifier—the administrative "remedies must indeed be 'available' to the prisoner."[59] "Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy unavailable and a court will excuse the prisoner's failure to exhaust."[60]

The WCJ has a written grievance policy that states it "is an internal administrative means for resolving complaints and identifying potentially problematic management areas" and "is designed to supplement, but not replace, the informal communication process and/or disciplinary procedures."[61] The WCJ's grievance policy includes three steps. First, a detainee must submit a grievance to the Pod Officer. "If the detainee does not receive a satisfactory response from the Pod Officer, then the detainee may complete in writing a grievance via the commissary kiosk or through the Detainee Communication Form and forward it to the Shift Lieutenant."[62] Second,

---

[55] *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

[56] *Jones v. Bock*, 549 U.S. 199, 211–12 (2007); *Freeman v. Watkins*, 479 F.3d 1257, 1259–60 (10th Cir. 2007).

[57] *Little v. Jones*, 607 F.3d 1245, 1249 (10th Cir. 2010) (citing *Woodford v. Ngo*, 548 U.S. 81, 90 (2006)).

[58] *Id.* (quoting *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002)).

[59] *Ross v. Blake*, 578 U.S. 632, 639 (2016).

[60] *Lindsey v. Cook*, No. 19-CV-03094-HLT, 2021 WL 483855, at *2 (D. Kan. Feb. 4, 2021) (quoting *Gray v. Sorrels*, 818 F. App'x 787, 789 (10th Cir. 2020)).

[61] Doc. 177 at 1.

[62] Doc. 177-25 at 2.

the Shift Supervisor must respond to the detainee's grievance within seven calendar days. Third, the detainee may file an appeal to the Administrator within ten calendar days of receiving an adverse decision from the Shift Supervisor.

Defendants attach to their motion for summary judgment the grievance file for Plaintiff, and his entire booking file is attached to the *Martinez* Report. Plaintiff attached several grievance forms to his declaration, as well. On this record, Defendants do not meet their burden of demonstrating that no disputed material fact exists regarding whether Plaintiff failed to fully exhaust his excessive force, denial of medical treatment, due process, and equal protection/discrimination claims. There are multiple grievances in the record that address these issues, many of which were reviewed by multiple parties.[63]

However, Defendants have shown that there is no dispute of material fact that Plaintiff failed to fully exhaust most of his retaliation claim. First, there are no grievance forms in the record naming Defendant Reid. Despite the Second Amended Complaint offering no specific facts about how she participated in any constitutional violation, the Pretrial Order alleges that she withheld showers, food, recreation time, and clean clothes from him. There is no grievance in the record about this. Second, there is no grievance about being retaliated against for talking to a camera crew.[64] Third, the only grievances naming Toms are July 2018 grievances alleging that Toms punished Plaintiff by taking his legal work and law library time away,[65] and grievance forms that purport to appeal her disciplinary decisions.[66] And fourth, while there are grievances

---

[63] Doc. 177-26 at 20–24; Doc. 186-4 at 33, 39, 41, 43–44, 47, 51.

[64] Plaintiff offers one ICF dated August 9, 2018, in which he asked for the addresses of several television and radio stations. Doc. 186-4 at 31. But this does not suffice to show that he (1) actually spoke to any of these media outlets; or (2) grieved a claim that he was retaliated against for doing so.

[65] Doc. 186-4 at 17, 18.

[66] Doc. 186-4 at 43–44.

in the record alleging that Patrick and Fewell improperly withheld his legal materials and mail in June 2018,[67] he did not file a grievance about Patrick's alleged threats to harm him or kill him. Therefore, these claims were not exhausted and Defendants' summary judgment is granted on these aspects of Plaintiff's retaliation claims.

### B.    Qualified Immunity

Defendants invoke qualified immunity as a defense to all remaining claims, which are brought against them in their individual capacity only. Thus, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, *and* (2) that the right was "clearly established" at the time of the challenged conduct.'"[68] Defendants will prevail on the qualified immunity defense if Plaintiff fails to establish either prong of the this test.[69] In making this determination, the Court "ordinarily accept[s] the plaintiff's version of the facts . . . but 'because at summary judgment we are beyond the pleading phase of the litigation, [the] plaintiff's version of the facts must find support in the record.'"[70] "[W]here, as here, the record contains videotapes capturing the events in question, the court 'view[s] the facts in the light depicted by the videotape.'"[71] As described below, the Court finds that Defendants are entitled to qualified immunity on each remaining claim.

---

[67] Doc. 186-4 at 3, 9–11.

[68] *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1217 (10th Cir. 2024) (quoting *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015)).

[69] *Id.* (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

[70] *Id.* (second and third alteration in original) (quoting *A.M.*, 830 F.3d at 1136).

[71] *Borneman v. Rozier*, 398 F. App'x 415, 418 (10th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)); *see also Blake v. Wallace*, No. 22-3163, 2024 WL 5087805, at *2 (10th Cir. Dec. 12, 2024) ("Where the video evidence blatantly contradicts a material factual allegation, we may disregard that allegation in favor of what is actually depicted on the video.").

1. **Excessive Force**

Plaintiff alleges a claim of excessive force against WCJ Deputies Lobner and Schuler. He claims that on October 27 and 28, 2018, they assaulted and battered him, dragged him down a flight of stairs, and then assaulted him again at the bottom of the stairs by pushing his face into the concrete floor and twisting his ankles. Plaintiff maintains that the officers' force was unprovoked; he was pleading for medical assistance. He asserts that one of the deputies placed knees on his throat while twisting his ankles, that he could not breathe and was begging them to stop, and that they placed him in a restraint chair for a longer period of time than regulations permit without access to a restroom.

Because Plaintiff was a pretrial detainee, his claim is governed by the Fourteenth Amendment's Due Process clause.[72] To show a constitutional violation, Plaintiff must demonstrate that each Defendant "purposely or knowingly us[ed] force against [him] that is 'objectively unreasonable.'"[73] The Supreme Court provides the following guidance on how to apply this standard:

> A court (judge or jury) cannot apply this standard mechanically. Rather, objective reasonableness turns on the "facts and circumstances of each particular case." A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," appropriately deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security."

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the

---

[72] *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979).

[73] *Rowell v. Bd. of Cnty. Comm'rs of Muskogee Cnty., Okla.*, 978 F.3d 1165, 1171 (10th Cir. 2020) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015)).

> relationship between the need for the use of force and the amount
> of force used; the extent of the plaintiff's injury; any effort made
> by the officer to temper or to limit the amount of force; the severity
> of the security problem at issue; the threat reasonably perceived by
> the officer; and whether the plaintiff was actively resisting.  We do
> not consider this list to be exclusive.  We mention these factors
> only to illustrate the types of objective circumstances potentially
> relevant to a determination of excessive force.[74]

Defendants argue that the video and facility reports from the WCJ's independent review make clear that Lobner's and Schuler's actions were objectively reasonable under the circumstances.  Indeed, three different officers who were not present at the time reviewed the reports and the body camera videos and concluded that they did not support Plaintiff's version of the events.  And although not attached to the summary judgment motion, Defendants refer the Court to the videos of this incident, which are part of the *Martinez* Report,[75] and were made available to Plaintiff to view.[76]  Under Rule 56(c)(3), the Court can consider any materials in the record on a motion for summary judgment.

The Court has reviewed the videos, which capture the excessive-force incident from various vantage points.  The videos do not support Plaintiff's assertions of objectively unreasonable force or any injuries sustained by him.  Before the officers arrived at his cell, Plaintiff had been yelling and banging on his cell after being denied a grievance form.  He incited the other inmates in the pod to yell and riot, causing a lockdown.  When officers arrived at Plaintiff's cell to assist him, he was uncooperative.  Plaintiff yelled while they were trying to call Medical on the radio.  They called a nurse to Plaintiff's cell to assess him and check his vital

---

[74] *Kingsley*, 576 U.S. at 397 (alterations in original) (first quoting *Graham v. Connor*, 490 U.S. 386, 396, (1989); and then quoting *Bell*, 441 U.S. at 540) (citations omitted).

[75] Doc. 35.

[76] On June 10, 2022, counsel for the Wyandotte County Sheriff filed a Certificate of Service (Doc. 46) indicating that Plaintiff viewed the videos on June 1, 2022, and again on June 8, 2022.  Plaintiff acknowledged this by initialing each video as set forth in the Index to Exhibit A to the Report.  Doc. 46-1.

signs. But Plaintiff was uncooperative with the nurse too, yelled, and demanded a different nurse, calling the current nurse "stupid" and "an imbecile" and yelling that they "sent him the B team." Plaintiff admitted to these statements later at his disciplinary hearing. Plaintiff refused to walk to the wheel chair outside his cell and resisted staff's attempts to help, either tensing up or going limp with dead weight. In response, they laid him on his stomach and cuffed him at the wrists and ankles before carrying him down the stairs in a "five man carry" technique. One officer said to "watch his hair" while they carried him. At the bottom of the stairs Plaintiff began twisting and continued to yell at the other inmates that he was not resisting. But it is apparent on the video that he was resisting. The officers laid him back down on the ground at the bottom of the stairs and pushed his ankles toward his back until he calmed down. They did not place a knee on his neck.

When staff attempted to talk to Plaintiff, he just continued to scream, telling them they are "a piece of shit," he is going to have a field day with this, and that this is a civil suit waiting to happen. During the incident, Plaintiff is yelling out to the other inmates, and they begin yelling and kicking their doors. The entire pod remained on lockdown through the next day and the inmates in the pod lost their tablet privileges for that day. Because the incident is shown on multiple videos, the Court construes the facts consistent with those videos, which directly refute Plaintiff's assertions in his pleadings, response, and affidavits.

Moreover, the medical records from WCJ demonstrate that Plaintiff did not endure any serious injury due to the alleged use of force. Medical treated Plaintiff several times in November through January after he complained of back pain and provided him with Tylenol. On

January 9, 2019, a scan of his lumbar spine was normal.[77]  There are no medical records indicating any serious injury.

Under the relevant factors set forth in *Kingsley*, Defendants conduct was not objectively unreasonable, particularly when viewed in light of their past experience with Plaintiff as a detainee at the facility, which included a lengthy disciplinary history.  It is clear to the Court that the amount of force used was the least amount necessary under the circumstances, that the extent of any injury to Plaintiff was minimal, that the officers tempered the amount of force by repeatedly checking Plaintiff's hand and ankle restraints and obtaining medical care, and that they were dealing with a severe security problem due to Plaintiff inciting the other detainees causing a lockdown.  Given the security situation, Defendant's size, his resistance, and his past disciplinary history, the officers reasonably perceived him to be a threat to their safety.  Plaintiff fails to demonstrate that Defendants "purposely or knowingly us[ed] force against [him] that is 'objectively unreasonable.'"[78]

Even if the Court found that there was a genuine issue of material fact about whether Plaintiff could demonstrate a constitutional violation, he has not shown that Defendants' conduct violated clearly established law.  To show a violation of clearly established law, "existing precedent must have placed the statutory or constitutional question beyond debate."[79]  "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect [ing] all but the plainly incompetent or those who knowingly violate the

---

[77] Doc. 177-24 at 24.

[78] *Rowell v. Bd. of Cnty. Comm'rs of Muskogee Cnty., Okla.*, 978 F.3d 1165, 1171 (10th Cir. 2020) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015)).

[79] *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).

law.'"[80]  "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."[81]

Plaintiff fails to identify existing precedent that squarely governs the facts of this case. He cites several unpublished district court cases outside of the Tenth Circuit that he argues apply here because they find excessive force during "cell extractions."[82]  These cases are insufficient to meet Plaintiff's burden of demonstrating Defendants violated clearly established law.  First, unpublished district court cases from outside of this circuit do not suffice to demonstrate "clearly established law."[83]  Second, none of these cases hold that the type of cell extraction that occurred here conclusively constitutes excessive force.  Two of these cases did not reach the issue of whether the officers' conduct constituted excessive force,[84] and the third case found evidence of excessive force where the inmate was non-resistant and the officers used what the Court found was gratuitous force.[85]  As described above, the videos and record evidence in this case reflect that Plaintiff was alternately uncooperative and resistant, which is why officers were required

---

[80] *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

[81] *Kisela*, 584 U.S. at 104 (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)).

[82] *See Mateo v. Waltz*, No. 3:21-CV-00552, 2023 WL 6321765 (M.D. Pa. Sept. 28, 2023); *Rosario v. Westmoreland County*, No. CV 21-208, 2023 WL 10949055, at *8–9 (W.D. Pa. Nov. 2, 2023), *report and recommendation adopted*, No. 2:21-CV-208, 2024 WL 1326349 (W.D. Pa. Mar. 28, 2024); *Brown v. Woods*, No. 3:20-CV-87-HLA-MCR, 2022 WL 479885 (M.D. Fla. Feb. 16, 2022).

[83] *Ullery v. Bradley*, 949 F.3d 1282, 1292 (10th Cir. 2020) (explaining that in deciding whether a right is clearly established, the Court can consider Supreme Court precedent, as well as "binding circuit precedent and decisions from other circuits").

[84] *Rosario*, 2023 WL 10949055, at *8–9 (denying motion to dismiss by officers on excessive force claim because they argued an incorrect standard applied); *Brown*, 2022 WL 479885, at *13–14 (denying summary judgment because there was a genuine issue of material fact about whether the plaintiff disregarded officers' orders and whether officers used unreasonable force to extract him from his cell; video evidence did not fully capture the officers' interactions with the plaintiff).

[85] *Mateo*, 2023 WL 6321765, at *7 ("[I]t is apparent to us that any reasonable officer would have known in May 2019 that this gratuitous forceful twisting or contortion of a subdued detainee's shackled arms was unlawful.").

to utilize a five-point hold to get him down the stairs.  Once at the bottom of the stairs, Defendant was resistant and attempted to further incite his fellow inmates.  Once he stopped resisting, the officers were able to move him into the restraint chair.  Accordingly, there is no clearly established law that the officers' actions on these facts constituted excessive force under the Fourteenth Amendment.

### 2. Denial of Medical Care—Deliberate Indifference

Plaintiff asserts in his filings that he was a medically "at risk" inmate, and that on the evening of October 27, 2018, he was denied medical treatment for "over a significant period of time," despite his pleas for help.[86]  He asserts that he was suffering from "intense, excruciating and unbearable pains and symptoms" of chest pains until he fell unconscious and was awakened "an hour or so later with several deputies in my cell either standing over me or going through my legal paperwork."[87]

"[D]eliberate indifference to a pretrial detainee's serious medical needs includes both an objective and a subjective component."[88]  "To establish the objective component, 'the alleged deprivation must be "sufficiently serious" to constitute a deprivation of constitutional dimension.'"[89]  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[90]  The "negligent failure to provide adequate

---

[86] Doc. 191 at 32.

[87] *Id.* at 32–33.

[88] *Strain v. Regalado*, 977 F.3d 984, 989 (10th Cir. 2020) (finding that although a pretrial detainee's claim is based on the Fourteenth Amendment, the same deliberate indifference standard for Eighth Amendment claims applies).

[89] *Id.* at 989–90 (quoting *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006)).

[90] *Id.* at 990 (quoting *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018)).

medical care, even one constituting medical malpractice, does not give rise to a constitutional violation."[91]

In situations where treatment was delayed rather than denied altogether, the Tenth Circuit requires a showing that the inmate suffered "substantial harm" as a result of the delay.[92] "The substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'"[93] As already explained, the Court credits the video of events on October 27, which conflicts with Plaintiff's version of the facts. And the video makes clear that although medical treatment was delayed, it did not cause Plaintiff substantial harm. The video and WCJ records show that Plaintiff's blood pressure was within normal range, despite his failure to cooperate with the nurse's ability to take all of his vital signs, and there is no record that he suffered from lifelong handicap, permanent loss, or considerable pain that resulted from the delay in medical treatment.[94]

Records kept at the WCJ show that on October 28, 2018, at 2:35 a.m., medical responded to a call to evaluate Plaintiff due to chest pains. And the record includes the Affidavit of Dee-Dee Gregory RN, BSN, HSA, which provides that:

> 5.     When medical arrived, Vann was sitting on the floor with security staff helping him sit up. Vann did not appear to be in any distress but refused to follow instructions.
>
> 6.     Medical staff tried obtaining vital signs but Vann was uncooperative and pushed the thermometer probe from his mouth with his tongue.

---

[91] *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

[92] *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (citation omitted).

[93] *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)).

[94] *See* Doc. 177-24 (describing Plaintiff's medical treatment during his detention, showing no further treatment tied to any delay in treatment for chest pains).

> 7. Next his blood pressure was obtained and it was directed that he be moved to the clinic to conduct an EKG but Vann stated he was unable to stand.
>
> 8. A wheel chair was brought and Vann was informed he had to be taken down stairs in order to transport him to the clinic with the wheel chair.
>
> 9. When security staff tried to help him to his feet, he refused to cooperate with security staff and so he had to be restrained. Medical checked blood circulation and validated the restraints weren't cutting off blood flow.[95]

WCJ records show that Plaintiff was seen by medical staff several times after this incident, eventually because he was refusing meals and claiming to be on a hunger strike.[96]  In sum, Plaintiff has failed to demonstrate the objective prong of his deliberate indifference claim.

Plaintiff also fails to satisfy the subjective prong.  The Supreme Court has insisted upon actual knowledge: "the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*."[97]  Plaintiff claims there was a delay in receiving medical care and he was unsatisfied with the nurse that was summoned to his cell.  This apparent disagreement over course of treatment, however, does not rise to the level of a constitutional violation.[98]  And Mesler attests that when he checked on Plaintiff, he did not appear to be in distress.  When the officers entered his cell, they immediately tended to him, giving him a sternum rub and sitting him up so that the nurse could check his vitals, a process he failed to cooperate with.  Plaintiff has failed to show that Mesler was both aware of facts from which he could infer that a substantial risk of serious harm existed,

---

[95] Doc. 177-24 ¶¶ 5–9.

[96] Doc. 177-24 at 113–22

[97] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (emphasis added).

[98] *Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010).

and that he also drew the inference. Accordingly, Plaintiff has not demonstrated that Mesler violated his clearly established constitutional rights through deliberate indifference to his serious medical needs.

### 3. Due Process

Plaintiff alleges in Count III a due process claim against Toms, Patrick, and Fewell. Plaintiff alleges that Toms did not allow Plaintiff to call witnesses in his disciplinary hearings, and that she conspired with Major Patrick and Warden Fewell to keep Plaintiff in segregation to conceal his injuries. The Court first considers Plaintiff's challenge to the process afforded him during his disciplinary hearings, which applies to Toms only. Then, the Court turns to Plaintiff's due process challenge to the disciplinary segregation sanction.

### a. Disciplinary Hearing

An inmate is entitled to due process at a disciplinary hearing that resulted in the loss of good conduct time.[99] However, because prison disciplinary proceedings "take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully" detained, the "full panoply of rights due a defendant in [criminal] proceedings does not apply."[100] In *Wolff*, the Supreme Court held that in order to satisfy due process in a prison disciplinary proceeding, the inmate must receive: (1) "advance written notice of the claimed violation" no less than 24 hours prior to the hearing; (2) an opportunity "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals;" and (3) a "written

---

[99] *Howard v. Bureau of Prisons*, 487 F.3d 808, 811 (10th Cir. 2007).

[100] *Wolff v. McDonnell*, 418 U.S. 539, 556, 561 (1974); *see also Williamson v. Stirling*, 912 F.3d 154, 176 (4th Cir. 2018) ("[A] jail official that seeks to discipline a pretrial detainee must provide the detainee with at least the procedural protections required by the *Wolff* decision.").

statement by the factfinders as to the evidence relied on and reasons for the disciplinary action."[101]  Additionally, there must be some evidence to support the decision and the decisionmaker must be impartial.[102]

Plaintiff's version of the facts relevant to the due process claim do not find support in the record, thus, he has failed to demonstrate a constitutional violation.  Toms was the DHO at both hearings, and she was not present for the incidents that gave rise to those hearings.  There is no nonconclusory evidence that she was not impartial.  The record also reflects that Plaintiff was served with written notice of the violations within 24 hours, and with notices of his disciplinary hearings within the required 7-day timeframe set forth in the WCJ policy, and more than 24 hours before the hearings.

The record of the first disciplinary hearing shows that Plaintiff was provided with a written copy of the decision and the appeal form.  There is no record of Plaintiff using the appeal form to appeal the decision of the disciplinary hearing officer.  Likewise, the record shows that Plaintiff was provided with a written copy of the second hearing report and given an appeal form, but there is no record that he appealed that decision either.

Moreover, Toms' decision not to call Plaintiff's listed witnesses at the first hearing did not violate clearly established law.  The Supreme Court has made clear that an inmate's right to call witnesses in a disciplinary hearing is extremely limited.[103]  "Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses

---

[101] *Wolff*, 418 U.S. at 563–66 (citations omitted); *see also Abdulhaseeb*, 173 F. App'x at 661 (citing *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985)); *Smith v. Maschner*, 899 F.2d 940, 946 (10th Cir. 1990).

[102] *Gwinn v. Awmiller*, 354 F.3d 1211, 1219 (10th Cir. 2004) (citing *Wolff*, 418 U.S. at 592) (Marshall, J., concurring)).

[103] *Ponte v. Real*, 471 U.S. 491, 498  (1985).

that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence."[104]  Moreover, Plaintiff must be able to show that the testimony of his proposed witnesses would have affected the outcome of the hearing.[105]

Although Plaintiff requested a witness by the name of Bruce Tyren at his first hearing, staff could not locate an inmate in custody by that name; indeed, Plaintiff's cell neighbor's name was Bruce Tyner.  In addition, the staff witnesses were unavailable as the incident occurred during the night shift and the hearing was conducted during the day and none of the requested staff witnesses were on duty or available at the time of the hearing.  Toms acted within her discretion to deny Plaintiff's request to call these witnesses.

Plaintiff also cannot show that their testimony would have affected the outcome of the hearing.  Toms considered the narrative reports written by sworn security staff and medical staff, body camera footage/recordings of the incident, footage/recordings obtained from the housing unit security cameras, and Plaintiff's own statements at the hearing.  And she attests that her findings and sanctions were based on the record only.  And as Defendants note, Tyner's affidavit is not inconsistent with the rest of the record on the violations with which Plaintiff was charged.  The malingering count was dismissed and he does not contest the facts associated with the other violations.  And the officers' affidavits in this case are consistent with the videos, but not with the Plaintiff's version of the facts.  Their testimony would not have changed the outcome.

At the second hearing, there is no record the Plaintiff made any requests for witnesses to appear at the hearing on November 2, 2018.  Toms reviewed the narrative reports, medical

---

[104] *Wolff*, 418 U.S. at 566.

[105] *Chesson v. Jaquez*, 986 F.2d 363, 366 (10th Cir. 1993); *Grossman v. Bruce*, 447 F.3d 801, 805 (10th Cir. 2006).

incident reports, and body camera video in rendering her decision. In line with WCJ policy, Toms' guilty findings were based on a preponderance of the evidence standard, which required her to determine that over 50% of the evidence indicates guilt.

In sum, Plaintiff's version of the facts do not find support in the record. The record demonstrates that Toms complied with all of the *Wolff* requirements for satisfying due process in a prison disciplinary proceeding—notice, the opportunity to present evidence within the confines of institutional safety and correctional goals, a written decision based on at least some evidence, and an impartial hearing officer. Toms is entitled to qualified immunity on this claim.

### b.     Disciplinary Segregation Sanction

Next, Plaintiff claims that Toms, Patrick, and Fewell conspired to impose an unduly long sanction of disciplinary segregation in order to conceal his injuries from the excessive force incident on October 27–28, 2018. First, the Court notes that there is no evidence in the record that Patrick or Fewell had any input or participated in any way in the disciplinary sanction. As stated above, Toms was the hearing officer and her written decision imposed the disciplinary segregation sanction based on the record alone. Because "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation,"[106] Plaintiff's claims against Patrick and Fewell based on Toms' disciplinary decision and sanction fail.

And though Toms personally participated in the imposition of the disciplinary segregation sanction, Plaintiff fails to demonstrate that it violated his clearly established right to due process. The Supreme Court has held that "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law . . . the proper inquiry is whether those conditions amount to

---

[106] *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).

punishment of the detainee."[107]  Pretrial detainees, "may not be punished prior to an adjudication of guilt in accordance with due process of law."[108]  "A person lawfully committed to pretrial detention has not been adjudged guilty of any crime . . . [and] has had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest."[109]  The government may "detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution."[110]

To determine whether restrictions are constitutionally impermissible, a court must ask two questions.[111]  "First, we must ask whether an 'expressed intent to punish on the part of detention facility officials' exists" and "[i]f so, liability may attach.  If not, a plaintiff may still prove unconstitutional punishment by showing that the restriction in question bears no reasonable relationship to any legitimate governmental objective."[112]

The government has "legitimate interests that stem from its need to manage the facility in which the individual is detained."[113]  "Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial."[114]  "[I]n addition to ensuring the detainees' presence

---

[107] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Littlefield v. Deland*, 641 F.2d 729, 731 (10th Cir. 1981).

[108] *Bell*, 441 U.S. at 535.

[109] *Id*. at 536 (second and third alterations in original) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)).

[110] *Id*. at 536–37.

[111] *Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013).

[112] *Id*. (citing *Bell*, 441 U.S. at 538–39).

[113] *Bell*, 441 U.S. at 540.

[114] *Id*.

at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment."[115]  The Supreme Court has warned that these decisions "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."[116]

The record reflects that Plaintiff's disciplinary segregation was not punitive, but was instead imposed incident to a legitimate government purpose—the institution's interest in maintaining jail security.[117]  Plaintiff had a history of disciplinary problems at WCJ, and his 82-day sanction was in direct response to findings that he incited a disturbance by other inmates, among other violations.[118]  Toms did not impose a sanction in excess of 30 days for any one violation.  Thus, Plaintiff has not shown that Toms' response to Plaintiff's disciplinary infractions was exaggerated, and that they were not imposed as part of a valid objective of maintaining effective management at the facility.  Accordingly, he has not demonstrated a constitutional violation under clearly established law and Defendants are entitled to qualified immunity on this claim.

---

[115] *Id.*

[116] *Id*. at 540 n.23.

[117] *See, e.g.*, *Waterman v. DeGroot*, No. 20-3243-SAC, 2021 WL 1840064, at *3 (D. Kan. May 7, 2021) ("If the Court were to agree with Plaintiff that he could not receive any discipline as a pretrial detainee, a pretrial detainee could break facility rules and cause disruptions with impunity.").

[118] *See Hubbard v. Nestor*, 830 F. App'x 574, 583 (10th Cir. 2020) ("[I]ntentionally punishing Plaintiff by placing him on disciplinary status or in disciplinary segregation without giving him an opportunity to be heard—violated his due process rights.").

### 4.     Retaliation

Plaintiff claims that various acts taken by Toms, Reid, Patrick, and Fewell were done in retaliation for Plaintiff filing grievances against them and speaking to a camera crew about being mistreated at the WCJ.  Plaintiff alleges that Toms placed Plaintiff in segregation for an indeterminate amount of time in retaliation for Plaintiff filing grievances.  Plaintiff alleges that Reid denied Plaintiff his food trays, showers, clean clothing, hygiene and recreation time while Plaintiff was in segregation.  Plaintiff alleges that Patrick threatened to leave Plaintiff in segregation "until he rots" unless Plaintiff ceased writing up his officers and writing the media. Plaintiff alleges that Patrick threatened to hurt Plaintiff and get away with it due to Plaintiff's placement in segregation, and to kill Plaintiff when he sees Plaintiff on the streets.  Plaintiff alleges that Fewell placed Plaintiff in segregation for an indefinite term in retaliation for speaking with a camera crew about his mistreatment at the WCJ, confiscated Plaintiff's legal work and mail, and blocked his access to the courts in retaliation for Plaintiff's filing grievances against him.  He also alleges that Fewell failed to inform Plaintiff about his mother's death, which forced him to cremate her contrary to his religious beliefs.

The Court has already granted summary judgment to Defendants as to most of these claims because Plaintiff failed  to administratively exhaust them.  Specifically, Defendants submitted proof that Plaintiff failed to exhaust his claims against Reid, Fewell, and Patrick; any claim based on retaliation for talking to the media; and claims against Patrick for threatening violence.  To the extent any of these claims have been exhausted, Plaintiff fails to demonstrate that Defendants retaliated against him for exercising his constitutional rights.

"[I]t is well established that an act in retaliation for the exercise of a constitutionally protected right is actionable under Section 1983 even if the act, when taken for a different reason, would have been proper."[119]  The Tenth Circuit has held that:

> Government retaliation against a plaintiff for exercising his or her First Amendment rights may be shown by proving the following elements: (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.[120]

"[However,] [a]n inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights."[121]  Thus, for this type of claim, "it is imperative that plaintiff's pleading be factual and not conclusory.  Mere allegations of constitutional retaliation will not suffice."[122]  "To prevail, a prisoner must show that the challenged actions would not have occurred 'but for' a retaliatory motive."[123]

Plaintiff fails to offer factual support about the camera crew he spoke to and when this occurred.[124]  Without that information, he cannot demonstrate that he was retaliated against for such conduct, assuming it is protected.  And although filing a grievance does constitute protected

---

[119] *Smith v. Maschner*, 899 F.2d 940, 947 (10th Cir. 1990) (citations omitted).

[120] *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).

[121] *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006) (alteration in original) (emphasis in original) (quoting *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998)).

[122] *Frazier v. Dubois*, 922 F.2d 560, 562 n. 1 (10th Cir. 1990).

[123] *Baughman v. Saffle*, 24 F. App'x 845, 848 (10th Cir. 2001).

[124] Plaintiff offers one ICF dated August 9, 2018, in which he asked for the addresses of several television and radio stations.  Doc. 186-4 at 31.  But the response from WCJ officials was that he needed to either obtain this information from his attorney, or fill out a separate request for each address request.  This does not show that Plaintiff in fact spoke to the media.  Moreover, this request was made well before the other events giving rise to this action, during a separate booking at WCJ.  It does not show that Defendants' conduct months later was substantially motivated in response to this request for information.

activity,[125] Plaintiff fails to allege facts that find support in the record on the second and third elements for any of the remaining retaliation claims against Defendants based on that protected activity. As described on the due process claim, the record makes clear that Toms imposed a sanction of disciplinary segregation after she found Plaintiff guilty of violating multiple WCJ rules of conduct. Her guilty finding was by a preponderance of the evidence, she was not involved in the underlying events, and she followed the WCJ guidelines for the maximum terms of disciplinary segregation based on those violations. Moreover, she states in her affidavit that she was not aware of any grievances that Plaintiff filed against her, and Toms issued the certificate that allowed for Plaintiff's early release from disciplinary segregation due to his good behavior.

Plaintiff claims that he went "several days" without a shower and missed his food tray "several times," but he otherwise fails to give details on when or how often Reid denied him food, medical assistance, showers, clean clothing, and recreation. His conclusory allegations are not supported by the record. WCJ records show that he was consistently provided with food; medical, dental, and behavioral health services; regular opportunities to shower and clean his room; and regular access to mail services. He also does not allege any facts that Reid was aware of him filing grievances, or that her conduct was "substantially motivated" by Plaintiff's grievances.

The record does not support Plaintiff's allegations that Patrick retaliated against him for filing grievances. Nor has Plaintiff shown that Patrick's alleged threat to kill Plaintiff when he sees him on the streets, violated his constitutional rights. The Tenth Circuit has found that "[m]ere verbal threats or harassment do not rise to the level of a constitutional violation unless

---

[125] *See Gee v. Pacheco*, 627 F.3d 1178, 1189 (10th Cir. 2010).

they create 'terror of instant and unexpected death.'"[126]  It has also held that such verbal abuse is not sufficient to state a § 1983 claim alleging an Eighth Amendment violation.[127]

Finally, Plaintiff alleges that Fewell conspired with Toms and Patrick to keep him in disciplinary segregation, and that Patrick and Fewell took his legal work and kept him from the law library.  WCJ records show that Plaintiff filed multiple grievances regarding his mail and legal work in a prior booking with WCJ in the summer of 2018.  The grievances also show that Plaintiff's legal documents were returned to him after initially being confiscated as contraband because Plaintiff gave them to another inmate to make copies.  The legal documents were returned to Plaintiff on July 11, 2018.  This was more than two years before Plaintiff filed the instant action on July 24, 2020.  WCJ records also show that Plaintiff was routinely provided with his mail, including legal mail.

Finally, to the extent Plaintiff alleges a violation stemming from Defendants' delay in informing him of his mother's death, this claim too fails.  Plaintiff's mother died well after the events giving rise to this lawsuit arose, in October 2019.  An Incident Report written by Sgt. Sage shows that there was a misunderstanding about whether Plaintiff had been informed of his mother's death.  Sage received a call regarding Plaintiff's mother's passing on October 16, 2019, and asked "Mental Health Jenna" to tell Plaintiff.[128]  The next day Plaintiff was unaware of his mother's passing when he was escorted to sign the papers dealing with the care of his mother's

---

[126] *Alvarez v. Gonzales*, 155 F. App'x 393, 396 (10th Cir. 2005) (quoting *Northington v. Jackson*, 973 F.2d 1518, 1524 (10th Cir. 1992)).

[127] *See, e.g.*, *id*. (threats that officer would "burn this guy"); *McBride v. Deer*, 240 F.3d 1287, 1291 (10th Cir. 2001) (threats of being sprayed with mace); *Walker v. Young*, No. 91-4132, 1992 WL 49785 *2 (10th Cir. Mar. 17, 1992) (threats to "get even" and labelling as a snitch did not violate § 1983); *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979) (threats of being hanged); *see also Abeyta v. Chama Valley Indep. Sch. Dist.*, 77 F.3d 1253, 1256 (10th Cir. 1996) (stating that "even extreme verbal abuse typically is insufficient to establish a constitutional deprivation").

[128] Doc. 34–7 at 45

passing. Sage thought mental health had advised Plaintiff and stated that he "would have had deputies notify inmate Vann of his mother's passing shortly after [he] found out if mental health would have told [him] they were not going to talk to him."[129]  Although the Court is sympathetic to the distress this delay caused Plaintiff, nothing suggests that the one-day delay in notifying Plaintiff was anything other than an inadvertent miscommunication among staff.  It does not amount to a constitutional violation.

In sum, to the limited extent Plaintiff exhausted his administrative remedies on his retaliation claims, he fails to demonstrate a constitutional violation sufficient to overcome Defendants' invocation of qualified immunity.

### 5.    Discrimination—Equal Protection

Plaintiff alleges that he was kept in segregation longer than normal to hide his injuries and to stop him from exposing to the public the actions of white deputy sheriffs beating Black inmates.  Plaintiff alleges that he was denied due process at his disciplinary hearing and Defendant Toms retaliated against Plaintiff for filing grievances.  Plaintiff claims that he received harsher treatment by Defendant Toms at his disciplinary hearings because of his race and religion—he is Black and a practicing Muslim.  Plaintiff alleges he was left in disciplinary segregation longer than other inmates who were white or Christian, and that Fewell and Patrick would let white inmates with violent write-ups out of segregation with minimum time served but refused to let Plaintiff out of segregation even though he had no violent write ups.

To allege an equal protection violation, a plaintiff must state facts indicating that the defendants treated him differently than other similarly situated individuals.[130]  Moreover,

---

[129] *Id.*

[130] *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

Plaintiff "must prove that the distinction between himself and other inmates was not reasonably related to some legitimate penological purpose."[131]

First, Plaintiff has failed to show that he was discriminated against or treated differently from similarly situated prisoners. The only support for these claims are his broad and conclusory statements, which are not sufficient to overcome qualified immunity. He fails to identify a similarly-situated individual who was treated differently under the same circumstances. Moreover, Plaintiff was serving time in disciplinary segregation based on violations that implicated jail security. Thus, he would have to show that other individuals with the same violations were treated differently. Plaintiff's failure to submit proof on this claim is fatal in light of Defendants' evidence that Plaintiff was not treated differently.

Toms' affidavit provides statistics about the sanctions received by other inmates for the same rules Plaintiff was found guilty of violating. They directly refute Plaintiff's conclusory assertions of discriminatory punishments. On each violation, Plaintiff was given the same sanction as others for the same violation. For example, Plaintiff received 15 days of disciplinary segregation for his October 28, 2018 violation for inciting or encouraging a group demonstration. In 2018, there were three total tickets written for this violation, and all inmates were given a 15-day disciplinary segregation sanction. And in 2019, there were two tickets written for this violation, with one being dismissed due to insufficient evidence and the other was given a 30-day disciplinary segregation sanction. Statistics for the other violations for which Plaintiff was found guilty show that Plaintiff's sanctions were consistent with those imposed on others for the same violation. Importantly, Plaintiff's disciplinary segregation time was longer due to being found guilty of multiple violations, for which consecutive terms were imposed. This was not unique—

---

[131] *Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994).

there were approximately 130 incidents in 2018 and 55 incidents in 2019 that resulted in multiple tickets being issued to one inmate.

Second, Plaintiff fails to demonstrate that his disciplinary segregation sanction was not related to a legitimate penological interest. As Toms explained, "[Plaintiff] displayed behaviors that pose a direct threat to the safety of persons and to the safe and secure operations of the facility," and his "segregation status was reviewed . . . on a weekly basis."[132] Records from the WCJ show that Plaintiff was placed in segregation on October 28, 2018, and his segregation time was completed on January 18, 2019, after demonstrating good behavior. On that date he was returned to the "indoctrination pod" and then was placed in a maximum custody unit on January 21, 2019. Plaintiff offers no evidence that controverts Defendants' evidence that his disciplinary segregation was reasonably related to the legitimate penological purpose of maintaining the safety and security of the WCJ. For all of these reasons, Defendants are entitled to qualified immunity on Plaintiff's equal protection claims.

### 6. Supervisory Liability

To impose liability under § 1983 on a defendant-supervisor not directly involved in an incident, the plaintiff must "plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well."[133] For example, "[a] defendant supervisor's promulgation, creation, implementation, or utilization of a policy that caused a deprivation of [the] plaintiff's rights

---

[132] Doc. 177-20 ¶¶ 56–57.

[133] *Dodds v. Richardson*, 614 F.3d 1185, 1198 (10th Cir. 2010); *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) ("[T]he three elements required to establish a successful § 1983 claim against a defendant based on his or her supervisory responsibilities [are]: (1) personal involvement; (2) causation[;] and (3) state of mind.").

could . . . constitute[] sufficient personal involvement."[134]  Alternatively, a defendant supervisor may be liable if he fails to supervise subordinates, thereby resulting in constitutional harm to the plaintiff.[135]

Here, Plaintiff has failed to support his claims of individual liability by any of the subordinate officers named as Defendants in this matter.  Thus, supervisory liability cannot flow to Defendants Fewell and Roland on the basis of their failure to supervise those subordinates' actions.  Nor can Plaintiff show that liability attaches to these Defendants for their own failures to act on his grievances.[136]  Thus, Defendants Roland and Fewell are entitled to qualified immunity on the supervisory liability claims.

## V.      Conclusion

After fully considering the record on summary judgment, the Court concludes that Defendants' motion for summary judgment must be granted.  Plaintiff failed to fully exhaust his administrative grievance rights on his claim for retaliation.  And Defendants are otherwise entitled to qualified immunity on Plaintiff's remaining § 1983 claims.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiff's Motion to Treat Verified Amended Complaints I and II as Part of the Summary Judgment Record (Doc. 188) is **granted in part and denied in part** as explained herein.

**IT IS FURTHER ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment or Alternative Motion to Dismiss (Doc. 176) is **granted**.  The Clerk is directed to enter Judgment in favor of Defendants and terminate this action.

---

[134] *Dodds*, 614 F.3d at 1195; *see also Burke v. Regaldo*, 935 F.3d 960, 997 (10th Cir. 2019).

[135] *Dodds*, 614 F.3d at 1195.

[136] *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) ("[A] denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983.").

**IT IS SO ORDERED.**

Dated: March 18, 2025

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE